IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 18, 2008

Charles R. Fulbruge III
Clerk

No. 05-20997

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ANDRE DION BROWN; OTUKAYODE ADELEKE OTUFALE;
CHICHA KAZEMBE COMBS; JOHN DAVID WILEY, III;
ANTHONY DWAYNE ESSETT

Defendants-Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, DAVIS, and BARKSDALE, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The appellants were pharmacists who were convicted of illegally conspiring with doctors to distribute large quantities of medicines under cover of false prescriptions written by the doctors.

A hung jury ended their first trial. In a second trial the appellants were convicted of the charged crimes. All defendants timely appealed.

## I. BACKGROUND AND FACTS

In 2002, a Texas doctor, Dr. Callie Herpin, then working at a pediatrics clinic, met Isaac Achobe, who owned and operated a pharmacy in her building. Herpin had grown tired of the rigors of practice, and Achobe suggested that Herpin open a "pain management" clinic. Such clinics are enterprises specializing in the distribution of powerful pain killers and related drugs. Some clinics operate within the bounds of the law and serve a valuable medical purpose, but others flood the streets with dangerous, addictive narcotics while preserving some trappings of lawful medical practice. Hydrocodone, one of the drugs at issue in this case, is one such narcotic.[1] The other drug at issue, promethazine with codeine, is a strong medicinal syrup, often consumed in combination with alcohol and other substances.[2] The Houston area is a hot-spot for the distribution and consumption of these narcotics.

In his conversation with Herpin, Achobe referred her to Drs. Peters and Gbanaador, who ran "pain management" clinics. Achobe gave other advice about running a pain management practice and assured her that he could send "patients" to her. Herpin opened her practice, C.H. Medical Consultants, in Houston, in September 2002. Many of Herpin's "patients" were drug dealers and

---

[1] Hydrocodone is the generic name for a common, widely distributed, opioid narcotic analgesic, which is produced in various combinations under brand names such as Lorcet, Lortab, and Vicodin.

[2] Street users often combine promethazine with codeine with opioids such as hydrocodone for intensified, and yet more toxic, effect. They also mix it with sugary candy or drinks, such as Jolly Ranchers or Sprite. Street names of promethazine with codeine and similar syrups include "purple," "purple drank," or simply "syrup."

addicts who would purchase non-medically-indicated prescriptions[3] from her and have them filled at pharmacies such as those run by appellants. They could then consume the drugs or resell them on the streets for significant mark-ups. Herpin soon went from writing a couple of fraudulent prescriptions ("scripts") for each of her patients to selling long lists of fictitious patient names with corresponding prescriptions. In short, Herpin ran what is referred to as a "script mill."

Herpin testified as a government witness, having pled to drug violations as well as to large-scale, unrelated Medicare fraud. Etta Williams, who also testified for the government pursuant to a plea agreement,[4] started as a "patient" of Herpin's, buying illicit prescriptions in her own name and in the names of family members. She was eventually hired by Herpin and played a large role in developing the script mill at C.H. Medical Consultants, beginning in early 2003. Another government witness, Tresy Eze, also started as a drug dealing "patient" of Herpin but then came to work at Herpin's front desk, and to take care of Herpin's baby. At the height of their activities, Herpin and her staff used phone books and computer data manipulation to generate lists of names for

---

[3] Often either the individuals named on the prescription would not be present at all, or if they were, only the most cursory of exams would suffice for Herpin to write an individual a prescription as per their request.

[4] Williams pled to conspiracy to commit health care fraud, conspiracy to unlawfully dispense and distribute the controlled substances hydrocodone and promethazine with codeine, and money laundering.

prescriptions.[5] Records suggest that Herpin's clinic generated up to twenty-five thousand dollars a day, in cash, in revenue from prescriptions.

In January 2003, Herpin came to the attention of the Drug Enforcement Agency's diversion unit, which investigates the diversion of licit substances into illicit markets. Undercover law enforcement officers purchased illegitimate prescriptions from Herpin over a three month period and had the prescriptions filled at the pharmacy of appellant Otukayode Otufale. Based on these controlled purchases, DEA obtained search warrants for Herpin's office and Etta Williams' residence. In an August 23, 2003, raid, DEA agents seized lists of fictitious patients, cash, promethazine with codeine, computers, pre-printed prescriptions, and doctor dispensing reports.[6] The investigation brought appellants' and others' pharmacies to DEA's attention. DEA agents served notices of inspection on the pharmacies, visited the pharmacies, questioned the pharmacists, and obtained copies of dispensing reports.

On September 29, 2004, a federal grand jury sitting in the Houston Division of the Southern District of Texas returned a 121 count indictment against the appellants and others. A 190 count superceding indictment issued on November 24, 2004, and the case went to trial. On May 17, 2005, after thirteen days of trial proceedings, and five days of jury deliberation without a verdict, Judge Hittner of the United States District Court for the Southern District of Texas declared a mistrial due to the hung jury.

---

[5] Williams would on occasion instruct the clinic's customers where to fill certain prescription lists, based on which pharmacies had filled lists with those names before and would be able to expedite the process of filling prescriptions because the personal information of those "patients" would already be on record.

[6] Dispensing reports are maintained by pharmacists to track the prescriptions they fill. Herpin had requested that some of the pharmacies provide copies of their reports to her.

4

On June 9, 2005, the grand jury handed down an 82 count second superceding indictment charging the appellants as well as four other defendants with numerous crimes related to their drug conspiracy.[7] The indictment included notices of criminal forfeiture pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853. The second jury trial began on August 16, 2005, and on October 4, 2005 the jury convicted the appellants of all offenses charged under the indictment. All were convicted of one count of conspiracy to unlawfully distribute two controlled substances, hydrocodone (a Schedule III controlled substance) and promethazine with codeine (a Schedule V controlled substance), from October 2002 to December 2003.[8] Otufale was also convicted of actual distribution from December 2002 to August 2003.[9] Combs and Brown were convicted of distribution from January to November 2003.[10] Wiley and Esset were convicted

---

[7] The additional defendants were Omar Fahie, Will Bailey, Eric Craft, and Isaac Achobe. Fahie plead guilty to two counts on August 4, 2005. Bailey's case was severed and he pled guilty to two counts on October 18, 2005. Craft's case was severed and at trial he was convicted, on October 19, 2005, of all charges; his appeal was affirmed by this court in United States v. Craft, No. 06-20396, 220 F. App'x 304, 307 (5th Cir. 2007) (noting that at his trial the government "constructed a case against Craft that is only trivialized by referring to it as overwhelming."). Achobe was tried and convicted alongside the appellants, but his appeal was severed from his co-defendants' appeals and is before this court in United States v. Achobe, No. 06-20229, the opinion in which is filed simultaneously with this opinion.

[8] According to Count One of the indictment, the defendants "each aided and abetted by the other and by others known and unknown to the grand jury, did knowingly and intentionally combine, conspire, confederate and agree to unlawfully dispense and distribute, outside the scope of professional practice and not for a legitimate medical purpose," the two drugs, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 846. See also 21 C.F.R. § 1306.04(a) (providing regulatory interpretation of the statutory provisions forming the basis of the charges).

[9] Under Count Two, for hydrocodone, and Count Three, for promethazine with codeine. These counts omit charges under 21 U.S.C. § 846 but add charges under 18 U.S.C. § 2.

[10] Under Counts Six (hydrocodone) and Seven (promethazine with codeine).

of distribution from December 2002 to December 2003.[11] Otufale was convicted of seven counts of Money Laundering Promotion.[12] Combs and Brown were convicted of ten counts of Money Laundering Promotion[13] and seven counts of Money Laundering Concealment.[14] Wiley and Essett were convicted of ten counts of Money Laundering Promotion,[15] for fourteen counts of Money Laundering Concealment,[16] and for six counts of Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity.[17] Wiley was

---

[11] Under Counts Eight (hydrocodone) and Nine (promethazine with codeine).

[12] Under Counts Twelve through Nineteen, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). For checks written to Anda, Inc., VIP Pharmaceuticals, Harvard Drug Co., and Top RX from March 9 to June 28, 2003. Here as elsewhere the underlying specified unlawful activity was distribution in violation of 21 U.S.C. § 841(a)(1). Also, here as elsewhere defendants who aided and abetted were charged as principals pursuant to 18 U.S.C. § 2.

[13] Counts Twenty-Six through Thirty-Five. For checks written to Anda, Top RX, Harvard, and Cardinal Health, from February 19 to June 11, 2003.

[14] Counts Thirty-Six through Forty-Two, in violation of 18 U.S.C. 1956(a)(1)(B)(i). For cash deposits into certain accounts and a check made out to the pharmacy, from March 31 to April 14, 2003.

[15] Counts Forty-Three through Fifty-Two. For automatic debit payments to Walsh Southwest, Top RX, VIP, and Amerisource Bergan, from January 8 to November 10, 2003.

[16] Counts Fifty-Three to Sixty-Six. For cash deposits made to personal and pharmacy accounts from April 7 to November 20, 2003.

[17] Counts Sixty-Seven to Seventy-Two, in violation of 18 U.S.C. 1957. For checks and transfers (ranging from $26,140 to $96,433) from their pharmacy to their personal accounts from January 9 to August 7, 2003.

convicted of an additional three counts of this latter offense,[18] and Essett of a separate seven counts of the same offense as well.[19]

Pursuant to the court's findings and order, the appellants were subject to monetary penalties and to forfeiture of property.[20] They were also ordered to be imprisoned: Essett for 151 months,[21] and Wiley,[22] Combs,[23] Otufale,[24] and Brown[25] each for 120 months. Each sentence is to be followed by three years of supervised release. The sentences reflect upward departures based on the excessive quantities and the toxicity of the combination of drugs involved.

---

[18] Counts Seventy-Three through Seventy-Five. For three checks, written on April 30, August 25, and October 28, 2003, totaling $275,000, to pay for a personal residence in Cypress, Texas.

[19] Counts Seventy-Six through Eighty-Two. For checks and bill payments dating from March 31 to August 8, 2003, and totaling over $230,000.

[20] In addition to forfeitures, the court ordered Combs and Brown each to pay a special assessment of $1925, Otufale to pay a special assessment of $1025, Wiley to pay a special assessment of $3525, and Essett to pay a fine of $312,000 and a special assessment of $3925.

[21] 60 months each for Counts 1 and 8, 12 months for Count 9, 120 months each for Counts 67 to 72 and 76 to 82, and 151 months each for Counts 43 through 66, all concurrent.

[22] 60 months each for Counts 1 and 8, 12 months for Count 9, 120 months each for Counts 43 through 75, all concurrent.

[23] 60 months each for Counts 1 and 6, 12 months for Count 7, 120 months each for Counts 26 through 42, all concurrent.

[24] 60 months each for Counts 1 and 2, 12 months for Count 3, 120 months each for Counts 12 through 19, all concurrent.

[25] 60 months each for Counts 1 and 6, 12 months for Count 7, 120 months each for Counts 26 through 42, all concurrent.

The appellants owned and operated independent pharmacies.[26]  At trial, evidence established that all of these pharmacists filled large numbers of Herpin prescriptions.[27]   The government introduced additional evidence of each pharmacist's individual involvement in the drug distribution conspiracy:

(1) Otufale.   According to Herpin's testimony, she met Otufale in late 2002, when he dropped off Med-Stop coupons at her office; noticing her empty office, Otufale offered to send her patients. He also informed her that their mutual acquaintance (and unindicted co-conspirator) Dr. Peters was "hot," apparently meaning that he was under investigation by law enforcement officials.[28]

Their relationship blossomed.  Dispensing records show that over the charged time period, Otufale filled many thousands of Herpin prescriptions, including from lists of fictitious names.  May 2003 alone saw him fill 4,529 of her prescriptions.  For much of 2003, Otufale filled one to two hundred Herpin prescriptions per week for Williams (who was still dealing drugs while she was also working at Herpin's office), and occasionally he even sold her pint bottles of promethazine with codeine without labels.  The going

---

[26] Otukayode Otufale owned Med-Stop Pharmacy, which was in the same building as C.H. Medical Consultants; John Wiley and Anthony Essett owned I-10 East Pharmacy; and Andre Brown and Chicha Combs, through their jointly owned B&X RX, Inc., owned Mason Road Pharmacy in Katy, Texas.

[27] We refer to the appellants as pharmacists because they were licensed for the relevant period; they are apparently no longer so licensed, and are in any case incarcerated.

[28] Peters has pled to one count of money laundering.

price per bottle of promethazine with codeine between Williams and Otufale was seventy-five dollars.

A traffic stop of a man named Charlie Johnson uncovered bottles of hydrocodone and promethazine with codeine that had been dispensed by Med-Stop, bore labels of names other than that of Johnson, and listed Herpin as the prescribing physician. Many were dated to the same day that they were discovered. Johnson himself was apparently abusing the syrup while driving.

The drug dealer Omar Fahie, one of Otufale's original co-defendants, testified that Otufale filled Herpin scripts for him once every week or two, off lists of up to one hundred names. Otufale filled many prescriptions of unindicted co-conspirators as well, including Drs. Gbaanador and Peters, as attested by Sharon Boutte (a drug dealer who acted as intermediary between Peters and Otufale), and by Med-Stop's dispensing records. Here as throughout, drug purchases were made almost exclusively in cash and without any health insurance involvement.

(2) Wiley and Essett. After her husband had a dispute with Otufale, Tresy Eze, an employee of Herpin, along with her husband, began to fill prescriptions at Wiley and Essett's pharmacy, I-10 East. Eze set up a meeting between Essett and Herpin, at which Essett sought to establish that Herpin was in fact a doctor by examining her office and asking her questions. Essett then volunteered to send her more "patients" and intimated that he understood the nature of her script business. Omar Fahie testified that he took Herpin prescriptions in his name and in the names of

people he knew to I-10 East beginning in December 2002. While he first brought with him the individuals in whose names the prescriptions were written, he later brought only their identification with him, and finally just brought in lists of names (up to four lists of twenty-five names each, all in one visit, at the height of the conspiracy). He paid exclusively in cash, up to twelve thousand dollars per visit, and no claims to insurance were made. He picked up the drugs in an area not generally open to the public, in boxes with approximately twenty-five bags of drugs packed in each box. Sharon Boutte testified that she too filled prescriptions, for up to five or six people at a time, at I-10 East, after Dr. Peters called the prescriptions in. She testified that she dealt with both Wiley and Essett and was eventually allowed to pick up the prescriptions without bringing in the individuals in whose name they were made out, and even without identification.

Etta Williams identified lists and scripts in evidence as Herpin prescriptions filled at I-10 East. These include scripts bearing fictitious names. All told, in the course of the charged conspiracy, I-10 East filled Herpin prescriptions for over three thousand pints of promethazine with codeine and over twenty-seven hundred 100-count bottles of hydrocodone. Records demonstrate that I-10 East filled massive quantities of prescriptions of these drugs for other doctors as well, including unindicted co-conspirators Drs. Peters and McClellan. I-10 East's revenue from non-suspicious drug sales was a small fraction of its total revenue.

(3) Brown and Combs. Brown and Combs opened Mason Road in January 2003. Their first month of business, they ordered sixty-three gallons of promethazine with codeine from a pharmaceutical supplier. Although at a considerable distance from Herpin's office, Mason Road filled many Herpin prescriptions, as well as many hundreds of prescriptions from other doctors including Dr. Peters. Sharon Boutte testified that she filled both Herpin and Peters prescriptions at Mason Road; the prescriptions, paid for in cash and conveniently packed into grocery bags before she arrived, were in her name and the names of others, identification for whom she was not required to provide. Both Combs and Brown filled her prescriptions. Eventually, she testified, because Brown was uncomfortable with her filling prescriptions at Mason Road every day, she decreased the frequency of her visits. Lists and scripts, from Herpin's office reveal that Mason Road filled prescriptions for many transparently fictitious individuals. Some lists, for instance, repeat last names and identifying information and merely change the first names of the individuals in whose names the prescriptions were issued. Other government evidence suggests patterns of prescription filling that are highly suspicious and suggest that Combs and Brown attempted to fit a thin veneer of legitimacy and legality on their large and profitable illegal activities. Combs and Brown also worked second jobs at the chain pharmacy Walgreens during the time of the conspiracy, and they conceded that not once had they filled a prescription for promethazine with codeine in the pint amount that was the norm for the many hundreds of Herpin

prescriptions they filled for promethazine with codeine from their own pharmacy.

As to the money laundering allegations, the government provided evidence from pharmaceutical distributors and pharmacy accounts, demonstrating that the appellants were spending some of their ill-gotten gains to buy more drugs and thus to "promote" further illegal distribution (money laundering promotion); evidence from accounts and other records of transactions designed to avoid reporting requirements and otherwise to disguise the nature of pharmacy monies (money laundering concealment); and evidence from other receipts and records demonstrating some uses to which profits were put (money laundering spending).

The government's case included testimony from Darryl Armstrong as well. Armstrong – who pled, pursuant to an agreement, to three of the twenty-one counts for which he was indicted[29] – was a co-owner of Stella Link Pharmacy in Houston. Armstrong, a pharmacist since 1990 who worked at Walgreens until 2003, when he opened his own pharmacy, testified that after filling a certain number of Herpin prescriptions and visiting her office, he realized that her "pain management" practice was in fact engaged in illegitimate drug distribution. Armstrong, a close friend of Wiley, also testified that he and Wiley discussed the activities of dealer Eric Craft. Wiley told Armstrong that if Craft was bringing him prescriptions he would be busy because "Eric was big." In a later conversation, Wiley assured Armstrong that as long as Craft provided a

---

[29] He pled to conspiracy to unlawfully distribute hydrocodone and promethazine with codeine, unlawful distribution of hydrocodone, and money laundering promotion.

prescription for each bottle of promethazine with codeine or each set of hydrocodone tables, "it would be okay." Wiley also told Armstrong, who asked him what to do with his influx of cash profits, not to make deposits for amounts in excess of ten thousand dollars in the course of a day. Armstrong's testimony supported the prosecution's evidence concerning the operation of the other pharmacies and of Herpin's office. Armstrong himself filled illicit prescriptions for Drs. Herpin, Peter, and Gbanaador. Armstrong reported on conversations with both Wiley and Essett concerning Herpin's lax prescription policies. Finally, he testified that Wiley said that his pharmacy was getting out of the syrup business because, with a legitimate medical clinic next door, the pharmacy could survive without being involved in the "pain management" business.

Both the government and the defendants introduced expert testimony to bolster their case. A government expert, and a practitioner in the "pain management" arena, Dr. Martin Grabois testified that he would not prescribe promethazine with codeine because its low codeine level made it unsuitable as a pain killer (it is usually prescribed as a cough suppressant). He testified that he had never heard of any doctors prescribing a hydrocodone-promethazine with codeine combination for pain. He opined that the Herpin prescriptions he was shown were clearly not prescribed legitimately, judging by both the content of the prescriptions and the fact that so many of them, near identical, were issued at once.

Dr. Everton Edmundson, another "pain management" specialist, testified for the defense that there was nothing "medically inappropriate" on the face of a Herpin prescription for promethazine with codeine and

13

hydrocodone, although he conceded that this was probably not an optimum regime for pain treatment. A Texas pharmacist, Walter Lemmons, who personally knew appellants Combs and Brown, reviewed numerous scripts that formed part of the case against the appellants. Providing a variety of explanations concerning how the scripts could be legitimate, he testified that the scripts were not on their face suspicious and that he would fill them, even many of them on the same day. He did concede, however, that these drugs had high potential for abuse and lists of scripts brought in day after day might raise his suspicions.

Another pharmacist, Fred Emmite, testified for the government about pharmacists' "corresponding responsibility" to insure the dispensing of drugs pursuant to valid medical purposes and that the prescriptions would have raised red flags and cause any pharmacist to be suspicious. He commented on a book that the prosecution entered into evidence, the Texas Pharmacy Laws and Regulations (2003), which every pharmacist is required to have on hand and which includes discussion of pharmacists' responsibilities, including a number of indicators (many of them present in this case) that should make pharmacists suspicious and tip them off to possible illegal activity.

In sum, the government conceded the circumstantial nature of its case, but it urged conviction on the basis of the overwhelming evidence of guilt discussed above. It argued that at a minimum, the appellants' behavior suggests that any ignorance of the illegitimacy of the prescriptions they filled was deliberate, and that it proved beyond a reasonable doubt each appellant had the requisite mental state for each crime for which he was convicted.

Throughout, the appellants' defense centered on their lack of necessary mental state. They insisted that they did not know the prescriptions they filled were illegitimate. For the most part, they abided by the formal requirements for pharmacies filling controlled substance prescriptions. Some appellants had on occasion called to confirm prescriptions with Herpin, had reacted negatively to Herpin's practices by either partially or altogether refusing to fulfill her prescriptions, and had otherwise insisted on observing the legal niceties required for pharmacists in their position. They attacked the government witnesses who testified pursuant to agreements, arguing that the jury should not credit the self-serving testimony of admitted criminals. At worst, they argued, they were negligent in failing to investigate suspicious behavior, require identification, and so on; but negligence, they noted, was not a sufficient mental state to support conviction.

The jury agreed with the government and convicted the appellants on all counts. The appellants raise a number of issues on appeal, regarding their trial, convictions, and sentences. We now turn to their arguments.

## II. SUFFICIENCY CHALLENGES

The appellants challenge the sufficiency of the evidence against them.[30] The standard for such claims is high. The question is one of the

---

[30] For the moment, we assume that all issues raised on appeal were preserved below by all appellants who raise them now. As noted infra, this assumption may not be supported in all cases and might provide alternative grounds for rejecting some of the arguments addressed herein or heighten the standard of review applicable to those claims. Our judgment as to the merits of the appellants's claims, even under the standards applied to properly

sufficiency of the evidence, not its credibility. "In reviewing the sufficiency of the evidence, we view the evidence and the inferences drawn therefrom in the light most favorable to the verdict, and we determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt."[31] Relevant for the instant case, "our standard of review does not change if the evidence that sustains the conviction is circumstantial rather than direct."[32] We discuss each sufficiency challenge in order.

## A. Substantive Drug Counts

The appellants challenge the sufficiency of the government's evidence as to their distribution of hydrocondone (a felony) and promethazine with codeine (a misdemeanor) under 21 U.S.C. § 841(a)(1). To convict on these substantive counts, "the government was required to prove '(1) that [each appellant] distributed or dispensed a controlled substance, (2) that he acted knowingly and intentionally, and (3) that he did so other than for a legitimate medical purpose and in the usual course of his professional practice.'"[33]

Appellants claim that they did not know the prescriptions were not issued "in the usual course" of medical treatment. But aside from two

---

preserved claims, allows us to avoid sorting out which issues have been preserved and raised by each appellant.

[31] United States v. Mitchell, 484 F.3d 762, 768 (5th Cir. 2007) (citations omitted).

[32] Id.(quoting United States v. Anderson, 174 F.3d 515, 522 (5th Cir. 1999) (citations omitted)).

[33] United States v. Norris, 780 F.2d 1207, 1209 (5th Cir. 1986) (quoting United States v. Rosen, 582 F.2d 1032, 1033 (5th Cir. 1978)).

counts, counts 28 and 32,[34] that the government concedes it failed to support, nothing suggests that the government failed to adduce sufficient evidence to secure the conviction of the appellants.  As the background section above demonstrates, the government amassed overwhelming testimonial and documentary evidence of guilt against each and every appellant.  The appellants cite some evidence that would support a not guilty verdict, but in light of the evidence against them, this evidence in their favor utterly fails to render the jury verdict unreasonable.

The convictions for distribution therefore stand, except as to counts 28 and 32.  The convictions of Brown and Combs under counts 28 and 32 must be and now are reversed.

## B. Conspiracy to Distribute

The appellants also challenge their convictions for conspiracy to distribute hydrocodone and promethazine with codeine.  In order to convict the appellants of conspiracy, the prosecution had to "show (1) an agreement between two or more people to violate federal drug laws, (2) defendant's knowledge of the agreement, and (3) defendant's voluntary participation in the agreement."[35] As on the substantive drug counts, the evidence of conspiracy was largely circumstantial[36] but unquestionably

---

[34] The government concedes that counts 28 and 32 must be reversed because the relevant receipts do not reflect that hydrocodone was purchased, and thus the threshold for charges under this statute were not reached.

[35]  United States v. Aguilar, 503 F.3d 431, 435 (5th Cir. 2007).

[36] See United States v. Mitchell, 484 F.3d 762 (5th Cir. 2007) (allowing for elements of conspiracy to be proven by circumstantial evidence).

compelling. The government has demonstrated, as it must, not that every conspirator knew every other conspirator but that every defendant knew at least one co-conspirator drug dealer and one co-conspirator pharmacist. "To be convicted of engaging in a criminal conspiracy, an individual 'need not know all the details of the unlawful enterprise or know the exact number or identity of all the co-conspirators, so long as he knowingly participates in some fashion in the larger objectives of the conspiracy.'"[37] It is clear that there was an illegal agreement among Herpin, her staff, the "patients" who bought and filled prescriptions, the appellants, and other doctors who advised and aided Herpin and the other co-conspirators.

The appellants argue that they did not knowingly participate in the conspiracy. But while the appellants ran different operations, and the specific types of involvement and knowledge demonstrated by the evidence differ, circumstantial evidence more than amply demonstrates that they each shared and advanced the goal of the conspiracy by knowingly filling illegal prescriptions, an activity that was a crucial link in the chain of this drug conspiracy.

The prosecution bore a heavy burden of proof in its attempt to demonstrate the requisite criminal behavior and state of mind as to each appellant, and it convinced the jury. Our review of the record reveals no insufficiency. The appellants have failed to point to any reason this verdict should not be upheld, and so it is.

---

[37] United States v. Garcia Abrego, 141 F.3d 142, 155 (5th Cir. 1998) (quoting United States v. Westbrook, 119 F.3d 1176, 1189 (5th Cir. 1997)).

## C. Money Laundering

### 1. Money Laundering Promotion

The money laundering promotion statute, 18 U.S.C. § 1956(a)(1)(A)(i), prohibits involving the "proceeds" of specified criminal activities in transactions intended to "promote" the carrying on of further unlawful activity. "To sustain a conviction under the money laundering promotion statute, the Government must show that the defendant: (1) conducted or attempted to conduct a financial transaction, (2) which the defendant then knew involved the proceeds of unlawful activity, (3) with the intent to promote or further unlawful activity."[38] The statute provides that the "unlawful activity" generating the proceeds must be a felony.[39] Appellants challenge the government's evidence supporting their money laundering promotion convictions on three grounds. They argue that (a) the government failed to prove the requisite involvement of funds from felonious activities, (b) the recent Supreme Court ruling in United States v. Santos renders the government's evidence of "proceeds" insufficient, and (c) Fifth Circuit precedent dictates that the requisite "promotion" activity under this statute does not include the behavior targeted by the government's evidence.

#### a. Felony

---

[38] United States v. Miles, 360 F.3d 472, 477 (5th Cir. 2004).

[39] See 18 U.S.C. § 1956(c)(1) (requiring that the defendant know "property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law . . . .").

The district court instructed the jury that in order to convict for money laundering, it must find beyond a reasonable doubt that the transactions charged in the indictment "involved the proceeds of a specified unlawful activity, namely, unlawfully dispensing and distributing a controlled substance, hydrocodone, knowing the prescription was written outside the scope of a medical doctor's professional practice and not for a legitimate purpose." This is a qualifying felony under the statute.

The appellants nevertheless challenge the sufficiency of the evidence on this score, in essence contending that the money involved in the charged transactions must derive exclusively from distribution of hydrocodone. Under the appellants's theory, if the charged transactions involved any funds from unlawful sales of promethazine with codeine (which is only a misdemeanor) or from other sources, then they cannot serve as the predicate for money laundering charges. But this is contrary to the plain language of the statute as well as to the relevant case law.[40] Evidence shows that, as the jury found, significant amounts of illegal hydrocodone money were involved in the charged transactions and thus provide sufficient evidence of an underlying felony.

### b. Proceeds

The recent decision by the Supreme Court in United States v. Santos[41] bears directly on the appellants' challenge to the "proceeds"

---

[40] See United States v. Bieganowski, 313 F.3d 264, 279-80 (5th Cir. 2002).

[41] 128 S. Ct. 2020 (2008).

element of the charges. In Santos, a deeply conflicted Supreme Court ruled on the definition of "proceeds" in certain money laundering contexts. The justices split 4-1-4, with Justice Stevens writing a concurrence in the judgment that provided the decisive fifth vote for the plurality. The precedential value of Santos is unclear outside of the narrow factual setting of that case, and the decision raises as many issues as it resolves for the lower courts.

Santos, who operated an illegal lottery, was convicted of illegal gambling and money laundering promotion. The latter crime carries a much steeper penalty than the gambling. The transactions that formed the proceeds element of the money laundering charge were payments made by Santos to lottery winners and to his "runners." Santos challenged the money laundering conviction on the theory that these were not proceeds (in the sense of profits) but rather were simply receipts or revenue used to cover his operating expenses, and therefore they were not sufficient to support a money laundering conviction. The question before the Court amounted to whether "proceeds" under the statute means only profits of the specified criminal activities, or whether it includes all receipts.

Invoking the rule of lenity in light of statutory ambiguity, the four-justice plurality, led by Justice Scalia, held that the money laundering conviction was invalid because "proceeds" includes only the profits of unlawful activity, not all receipts. Santos' payments to his employees and the lottery winners could not serve as the basis for money laundering charges, because the monies involved in those payments were not profits

21

but merely receipts necessary to paying his expenses. The plurality noted that the alternative position, the position that "proceeds" means receipts, runs into a significant "merger problem," because many crimes, such as the one at issue in Santos, would almost always support money laundering charges without requiring proof of any distinct laundering activities. This would give prosecutors an extremely powerful and probably unintended tool to bring much more severe charges than would otherwise be available for the underlying offenses.

Justice Stevens provided the fifth vote for this position, but unlike the majority he did not consider this definition to be this statute's definition of "proceeds" in all criminal contexts. Rather, he accepted the dissent's position that in other contexts – namely, when the sale of contraband and the operation of organized crime syndicates are involved – the legislative history of the statute suggests that Congress intended for all receipts to count as "proceeds." He would interpret "proceeds" in the statute to mean one thing in some criminal contexts and another thing in other criminal contexts.

The four justice dissent, per Justice Alito, argued that the term "proceeds" in the statute includes all receipts, and not just profits, in all contexts. Justice Alito pointed to other similar statutes, to legislative history, and to the purpose and functioning of the statute.

Ordinarily, a Court thus divided is considered to have ruled on the "narrower" grounds on which five justices actually agreed, but that ground

of agreement is not apparent in this case.[42] The dissent characterizes the "stare decisis" effect of Santos thus: "five Justices agree" that "proceeds" includes all receipts in the contraband context.[43] But Justice Scalia, for the plurality, characterizes the ground of agreement differently: "'proceeds' means 'profits' when there is no legislative history to the contrary. . . . It does not hold that the outcome is different when contrary legislative history does exist."[44] Justice Scalia allows that this leaves room for lawyers to argue that the interpretation should change when there is legislative history to the contrary. But Justice Scalia warns that only Justice Stevens seems to think that the statute could be interpreted differently in different contexts (the dissent too acknowledges that Stevens is the only justice adhering to this view).

Thus the outcome could be that in a future case in the contraband realm, Justice Stevens would switch his definition to receipts, but one or more Santos dissenter would join the majority in holding that "proceeds" means profits – not because they have changed their minds about what Congress intended, but because principles of stare decisis and statutory interpretation demand that "proceeds" in this statute be interpreted consistently. The instant case is further complicated because even if

---

[42] See United States v. Caparotta, 571 F.Supp. 2d 195, 197-200 (D.Me. 2008) (discussing the precedential effect and interpreting 21 U.S.C. § 853 in light of Santos).

[43] Santos, 128 S.Ct. at 2035 n. 1 (Alito, J., dissenting) (quoting Stevens, J., concurring in the judgment). In an unpublished opinion, a recent Third Circuit panel accepted this interpretation in a drug case. United States v. Fleming, 287 Fed. App'x 150, 155 (3d Cir. 2008).

[44] Santos, 128 S.Ct. at 2031; see United States v. Yusuf, 536 F.3d 178, 185-86, 189-90 (3d Cir. 2008).

proceeds includes all receipts in contraband cases, as the Santos dissenters and Justice Stevens might hold, prescription drugs might form a conceptually distinct category of contraband, since they are only contraband when and if dispensed illegally.

We need not decide these thorny issues. We hold that even if the Santos plurality's more stringent reading of the statute governs in this case, the appellants lose. Records introduced at trial demonstrate that they were buying hydrocodone for considerably less than they were selling it for. We view this in light of Justice Scalia's discussion of how profits could be proven:

> The "proceeds of specified unlawful activity" are the proceeds from the conduct sufficient to prove one predicate offense. Thus, to establish the proceeds element under the "profits" interpretation, the prosecution need only show that a single instance of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction. . . . What counts is whether the receipts from the charged unlawful act exceeded the costs fairly attributable to it.[45]

In the instant case, the government introduced ample, unchallenged evidence that the sales were profitable, even with overhead and supplies factored in as "costs fairly attributable" to the sale. Much of the profits from these sales was deposited into pharmacy bank accounts in cash, accounts from which the money used in the charged transactions was drawn. Having provided evidence of this, the government has sufficiently supported its case.[46]

---

[45] Santos, at 128 S.Ct. at 2029.

[46] Accord United States v. Poulsen, 568 F.Supp. 2d 885, 913-14 (S.D. Ohio 2008) ("Even if 'proceeds' means 'profits' here, the transactions forming the basis for the Defendants' money-laundering convictions did indeed involve the 'profits' of their securities and wire fraud

The appellants point to other language from the plurality: "[A] criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consist of what remains after expenses are paid. Defraying an activity's cost with its receipts simply will not be covered."[47] Money laundering, that is, covers the "removal of profits from criminal activity," and not the "mere payment of crime-related expenses."[48] But the money laundering here at issue does not involve "mere payment"; rather, it clearly involves payments for more drugs made out of accounts well-padded with the profits from the appellants' criminal enterprises.

The jury instructions below did not include a "profits" definition of proceeds, and therefore may have been defective in this regard, but they were not objected to below on these grounds and are therefore subject to plain error analysis.[49] "When a jury instruction omits or significantly misstates an essential element of an offense, the error may be severe enough to meet the plain-error standard."[50] In the case at hand, however, the error is nowhere near this standard. As noted above, not even after Santos is the law "clear" on what the prosecution should be required to prove as "proceeds" in this case; or, if profits

___

activities, not the gross receipts."); Yusuf, 536 F.3d at 189 ("[W]e hold that unpaid taxes, which are unlawfully disguised and retained by means of the filing of false tax returns through the U.S. mail, constitute 'proceeds' of mail fraud for purposes of supporting a charge of federal money laundering.").

[47] Id. at 2027.

[48] Id. at 2026, 2028-29.

[49] See FED. R. CIV. P. 30(d), 52(b).

[50] United States v. Stone, 960 F.2d 426, 434 (5th Cir. 1992) (finding that a jury instruction mistaken as to one element of the charged crime was not sufficient).

must be proved, how this must be done under these circumstances. And as we have explained, the government clearly demonstrated the requisite profits in this case; there was no "likelihood of a grave miscarriage of justice."[51]

### c. Promotion

Santos dealt with the "proceeds" element of money laundering, but the money laundering promotion charge also includes a "promotion" element, which requires distinct analysis. The appellants argue that because the money laundering promotion charges (aside from the two counts already reversed above) are supported by pharmacy orders to suppliers that include not only hydrocodone but also pharmacy operating supplies such as band-aids, there is insufficient evidence that the charged transactions were intended to promote unlawful activity. Furthermore, they claim that there is no proven link between the hydrocodone purchased in the charged transactions and the hydrocodone they illegally distributed.

"In examining the question of intent necessary for a money laundering promotion conviction, this court has held that the Government must present either direct proof of an intent to promote such illegal activity, or proof that a given type of transaction, on its face, indicates an intent to promote such illegal activity."[52] This Circuit, careful not to allow the money laundering statute to become a money spending statute, has noted that the "promotion" element of money laundering promotion cannot be met simply by demonstrating that the

---

[51] Id. (quoting United States v. Sellers, 926 F.2d 410, 417 (5th Cir. 1991)); Johnson v. United States, 520 U.S. 461, 466-70 (1997).

[52] United States v. Miles, 360 F.3d 472, 477 (5th Cir. 2004) (citing United States v. Brown, 186 F.3d 661, 670-71 (5th Cir. 1999)).

unlawfully earned monies were used to promote the continued functioning of an "otherwise legitimate business enterprise."[53]  For instance, paying the bills (payroll, rent, taxes) of a health care provider or a car dealership, even one engaged in frequent acts of fraud, may not suffice to support the promotion element. "The crime of money laundering promotion is aimed not at maintaining the legitimate aspects of a business nor at proscribing all expenditures of ill-gotten gains, but only at transactions which funnel ill-gotten gains directly back into the criminal venture."[54]

In the instant case, the government presented evidence of the appellants' purchasing more of the same drugs they were illegally distributing.  It is logically possible that the hydrocodone purchased in the charged transactions was all sold lawfully, with all the illegally sold hydrocodone obtained through other purchases.  We do not speak to other circumstances in which the promotion element with regard to a pharmacy would require more proof.  But in the instant case it is perfectly clear that the government cannot and need not trace every hydrocodone pill from distributor to dealer.  The appellants were illegally distributing staggering amounts of this highly addictive controlled substance; their further purchases of that substance clearly promote their illegal activity.

2. Money Laundering Concealment

---

[53] Brown, 186 F.3d at 670.

[54] Miles, 360 F.3d at 479.

Combs, Brown, Wiley, and Essett were also convicted of money laundering concealment, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).[55] This crime too requires the involvement of the "proceeds" discussed in the previous section, and that analysis applies equally to these charges.

The concealment convictions also require the government to demonstrate that the charged transactions be "designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control" of the money involved. This provision has been clarified by a recent Supreme Court decision, Cuellar v. United States. [56] In Cuellar, the Supreme Court overturned an en banc decision of this court.[57] The Court first held that the "designed to conceal" element of this statute does not require the government to prove that a defendant sought to "create the appearance of legitimate wealth," because in this provision of the statute, "Congress used broad language that captures more than classic money laundering."[58] However, the Court limited the statute's breadth somewhat: "[M]erely hiding funds during transportation is not sufficient to violate the

---

[55] Which specifies penalties for: "(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity – . . . (B) knowing that the transaction is designed in whole or in part – . . . (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . ."

[56] In the instant case, the relevant statutory provision criminalizes financial transactions designed to conceal, whereas the part discussed in Cuellar criminalizes transportation, transmission, or transfer to or through foreign lands designed to conceal. See 18 U.S.C. 1956(a)(2)(B)(i). But the Cuellar analysis applies with full force to the "designed to conceal" element, which is identical in the two provisions.

[57] Cuellar v. United States, 128 S.Ct. 1994 (2008) (overturning relevant portions of United States v. Cuellar, 478 F.3d 282 (5th Cir. 2007)).

[58] Cuellar, 128 S.Ct. at 2000.

statute, even if substantial efforts have been expended to conceal the money."[59] Under the facts of Cuellar, in which money was carefully hidden in order to transport it over the United States-Mexico border, the Court held that no evidence suggested the transportation was designed to conceal anything about the money; the concealment, rather, served the goal of transporation. The touchstone of the Cuellar Court's construal of the statute is the "design" element. The Court noted: "'There is a difference between concealing something to transport it, and transporting something to conceal it" . . . ; that is, how one moves the money is distinct from why one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter."[60]

In the instant case, we apply the doctrine of Cuellar and hold that the government's evidence is sufficient to satisfy that standard.[61] The very arguments the appellants make in challenging their convictions on other counts best demonstrate the reason that the concealment charges are valid. By their

---

[59] Id. at 2003.

[60] Id. at 2005 (quoting Cuellar, 478 F.3d at 296-97 (Smith, J., dissenting)).

[61] Our interpretation of Cuellar accords with a number of courts that have already interpreted it. See United States v. Warshak, 2008 WL 4059811, *2 (S.D. Ohio 2008) (finding concealment evidence satisfied by proffered testimony that the charged transactions in effect did conceal); United States v. Ness, 2008 WL 3842961 (S.D.N.Y. 2008) (finding concealment element met); United States v. Spencer, 2008 WL 4104693 (D.Minn. 2008) (finding concealment met by large cashier's check made up of drug receipts, used as a home down payment); United States v. Diaz, 2008 WL 4387209, *1 (S.D.N.Y. 2008) ("[T]he bank records presented at trial permitted a reasonable jury to infer that one of Defendant's purposes was to conceal or disguise the nature, location, source, ownership, or control of narcotics proceeds."); United States v. Mercedes, 283 F. App'x 862, 864 (2d Cir. 2008) ("In contrast to Cuellar, the evidence presented in this case indicated that the purpose of the attempted money transaction was to conceal the sources of the narcotics proceeds."); United States v. All Funds on Deposit at Citigroup Smith Barney Account No. 600-00338 Held in the Name of Kobi Alexander, 2008 WL 3049895, *6 n. 6 (E.D.N.Y. 2008) ("Even straightforward transactions can violate § 1956; the statute does not only criminalize the employment of convoluted methods to disguise one of the listed attributes.").

concealment contrivances, the defendants intended to and did make it more difficult for the government to trace and demonstrate the nature of these funds. While some aspects of "classic" money laundering are absent, many of them are present. The transactions were in cash so that they were not easily tracked. Most deposits were below ten thousand dollars so as to avoid setting off any reporting requirements that might then lead to unwanted attention concerning the funds' nature. Some of this behavior could also be reached by the "structuring" provisions of the money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(ii), but the government charged concealment and has produced sufficient evidence to support those charges.[62]

### 3. Money Laundering Spending

Wiley contends that his conviction for money laundering spending, under 18 U.S.C. § 1957, was insufficiently supported. His argument essentially is that since there was insufficient evidence of the distribution and conspiracy counts that represented the underlying criminal activity for the spending charges, there must accordingly be insufficient evidence of spending ill-gotten gains. This argument must fail, because the distribution and conspiracy convictions were supported by ample evidence.

## III. EVIDENTIARY CHALLENGES

### A. Cullings Testimony

---

[62] United States v. Stephenson, 183 F.3d 110 (2d Cir. 1999), cited by the appellants, is inapposite. There the court held that a mere act of structuring could not support a concealment conviction. In contrast to Stephenson, the many more numerous acts in the instant case are more clearly designed to conceal the nature of the monies.

Texas Department of Public Safety Trooper Steve Cullings pulled over an automobile driven by Charlie Johnson on July 29, 2003. Cullings determined that Johnson was under the influence of drugs and arrested him. A search incident to the arrest revealed unusual amounts of currency and white bags filled with thirty-four bottles of promethazine with codeine and five bottles of hydrocodone. Each bottle contained a label from Otufale's pharmacy, Med-Stop Pharmacy, and the labels also revealed that Herpin was the prescribing physician. Most of the promethazine bottles were filled on the same day on which Johnson was apprehended, July 29, 2003, and the hydrocodone bottles were filled on July 3, 2003. None of the bottles bore Johnson's name.

Over Otufale's objection, the district court permitted Cullings to testify as to this incident. Johnson did not testify, so there is no further evidence connecting Johnson and his cargo to Otufale. Otufale argues that Cullings should not have been allowed to testify because his testimony was not relevant under FED. R. EVID. 402, and, alternatively, because under FED. R. EVID. 403, any relevance is outweighed by prejudice to Otufale. The relevance argument is that this evidence was not probative of Otufale's knowledge, i.e., of whether he was filling scripts knowing that they were not issued for a legitimate medical purpose. The evidence, Otufale asserts, only reaffirms that there was not a legitimate purpose, which no appellant ever challenged. He continues that under Rule 403 balancing, even if the evidence was somehow relevant to Otufale's knowledge, the jury would be likely to confuse the issues of whether there was a legitimate purpose with Otufale's knowledge of legitimate purpose and would thereby be incited to an irrational verdict.

The district court did not abuse its discretion by admitting the evidence. Given the circumstances of this case and of the discovery of the evidence, this

was relevant circumstantial evidence as to the operations of an illegal conspiracy that other evidence demonstrated Otufale's knowledge of and involvement in. The bottles, their labels, and the circumstances of their discovery speak to Otufale's prescription-filling practices, which were precisely at issue. Although the relevance of this particular evidence is limited and there is some risk of prejudice, under Rule 403 balancing the relevance outweighs the risk of prejudice. By cross-examination, Otufale could undermine the weight of this evidence based on the lack of proof of closer connection between himself and Johnson. Otufale has not shown that the evidence should have been excluded under Rule 402 or 403.

Finally, even if the lower court had abused its discretion in admitting this evidence, the error is harmless, given the overwhelming evidence against Otufale.

## B. Peters Prescriptions

The prosecution elicited testimony at trial that the appellants filled not only illegitimate Herpin prescriptions but similar prescriptions written by other doctors, including Dr. Alonzo Peters. Combs argues that the district court abused its discretion by admitting testimony from Sharon Boutte about filling illegitimate prescriptions written by Dr. Peters and filled at Combs' pharmacy. Combs explains that this was uncharged conduct involving an unindicted conspirator, and that it should have been excluded.

The indictment charged the defendants with conspiring with Herpin and "others known and unknown," and the government asserts that Peters and others fell within the scope of the charged conspiracy. According to the

32

prosecution, illegitimate prescriptions filled for other, unnamed co-conspirator doctors during the time-frame of the conspiracy are "inextricably intertwined" with charged conduct (filling Herpin prescriptions), and therefore admissible. At trial, while maintaining such evidence was intrinsic, the prosecution gave notice according to FED. R. EVID. 404(b), to insure that it could in any case introduce this and other evidence (for instance, prescriptions from outside the time-frame of the conspiracy) as extrinsic but highly probative. The record does not clearly establish whether the evidence was admitted as intrinsic or extrinsic, so we look at both possibilities and find that either way there was no error.[63]

The challenged evidence has hallmarks of intrinsic evidence. "[E]vidence [is] 'intrinsic' when the evidence of the other act and evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged."[64] This court has "held that, where a conspiracy is charged, acts that are not alleged in the indictment may be admissible as part of the Government's proof."[65] Testimony at trial suggested that a conversation with Peters, set up by a co-conspirator pharmacist, helped set Herpin down her criminal path, and the behavior of Peters and other non-indicted co-conspirators resembled Herpin's. Doctors shared know-how, wrote scripts for similar quantities of similar controlled substances, and along with other players in this (admittedly loose) conspiracy, profited handsomely. While in a sense they were competitors (in the

---

[63] The government on appeal argues the evidence was all intrinsic, but the trial transcript suggests that it may have been admitted as extrinsic.

[64] United States v. Powers, 168 F.3d 741, 749 (5th Cir. 1999) (quoting United States v. Williams, 900 F.2d 823, 825 (5th Cir. 1990)) (citations and internal quotations omitted).

[65] Id.

same way that the co-conspirator pharmacists were competitors), in fact their activities were mutually advantageous, as the behavior of each doctor expanded operations for all by encouraging more dealers and pharmacists to get into the business.

That said, the evidence is not as clearly or completely intertwined with the central criminal conduct as in some other cases.[66] The evidence might therefore have been admitted as extrinsic evidence, as Rule 404(b) "other acts" evidence probative of "intent, . . . plan, knowledge, . . . or absence of mistake or accident." The critical issue at trial was whether the appellants filled Herpin's prescriptions knowing they were illegitimate, and appellants' experiences in filling piles of similar false prescriptions from a different doctor would speak directly to that issue.[67]

We hold that whether the court admitted the Peters evidence as intrinsic or as extrinsic, the court did not abuse its discretion in doing so.

## C. TPLR

---

[66] See United States v. Maceo, 947 F.2d 1191, 1199 (5th Cir. 1991) ( finding evidence that a conspirator received cocaine in lieu of legal fees intrinsic, explaining that "[t]he evidence that Bauman personally used cocaine with others involved in this drug trafficking ring and that he received cocaine as legal fees is clearly intertwined with the evidence necessary to prove he knew about the drug trafficking conspiracy and knowingly participated in it.")

[67] In United States v. Henry, this court considered a pharmacist who filled bogus prescriptions. On appeal, the pharmacist "complain[ed] that testimony concerning other prescriptions than those charged in the indictment, written by one Dr. Thomas, were evidence of extrinsic offenses, dissimilar to those charged, and highly prejudicial." 727 F.2d 1373, 1377 (5th Cir. 1984), rev'd on other grounds by 749 F.2d 203 (5th Cir. 1984) (en banc). The evidence was admitted under Rule 404(b), because the evidence went to intent, motive, and knowledge: "The extrinsic evidence provides background information concerning Henry's practices in dispensing Schedule II drugs to the same individual on a frequent basis in large quantities under at least questionable circumstances as to legitimate medical needs, and, thus, shows substantially identical acts. Thus, it is relevant and probative." Id. at 1378.

Texas Pharmacy Laws and Regulations is a large volume of laws, regulations, and other information, sent to every registered Texas pharmacy, each of which is required to maintain a copy of it. The relevant portions of the TPLR discuss the DEA's concern about diversion of prescription drugs to illicit uses, outline the responsibilities of pharmacists in helping to prevent this diversion, and provide tips and guidance for spotting illegitimate prescriptions. At trial, the government offered extensive testimony about the TPLR, had witnesses read portions of it to the jury, and mentioned it during closing arguments. It used the TPLR to bolster its case that the pharmacists were either aware that many of the prescriptions they filled were illegitimate or deliberately chose to be ignorant of this fact.

Wiley objected to the admission of the TPLR as irrelevant and as representing hearsay, and now he appeals their admission. Additionally, in a novel argument subject to plain error review, he argues that the government worked a Due Process violation by transforming a violation of the regulations and guidelines of the TPLR into a criminal offense.

Wiley claims that the prosecution used the TPLR to reshape the standards for criminal liability and to argue that the pharmacists' failure to comply with those standards inevitably amounted to deliberate ignorance. He argues that the resultant prejudice was magnified by jury instructions on deliberate ignorance and on pharmacists' "corresponding responsibility" not to fill suspicious prescriptions. Wiley notes there was no evidence the appellants had seen or read the book, and he argues that the government impermissibly used the TPLR to establish a guilty state of mind although this was mere hearsay.

Wiley's evidentiary arguments are without merit. The TPLR was a readily available volume designed in part to help pharmacists fulfill their

responsibilities without falling afoul of the criminal law. It is hardly irrelevant to establishing the appellants' state of mind or the fact that they may have turned a blind eye to the illegitimacy of the many false prescriptions they filled. We conclude that the TPLR is probative of the appellants' states of mind, speaking to their claims that nothing about the circumstances aroused their suspicions as to the illegitimate prescriptions. The book described factual circumstances under which an honest pharmacist's suspicions should be aroused, and many of those circumstances were present in this case. While the entire TPLR was not relevant on this point, the admission of the entire TPLR in fact minimizes any prejudice, since the jury could clearly see that the government was emphasizing individual parts of a much longer work that no pharmacist should be expected to master completely. Wiley's counsel remained vigilant throughout the trial, and the court took care to address his concerns throughout. Nor did the prosecution misuse the book; in fact, the trial transcript shows that the prosecution assiduously avoided using the book to demonstrate any inappropriate facts or states of mind.

Wiley's Due Process argument is also without merit. He appeals to United States v. Christo.[68] In that case, the defendant was charged with criminal misapplication of bank funds, but the indictment and trial evidence focused upon violations of a civil regulatory banking statute that concerned extending credit to bank officers. Christo argued "that an indictment may not charge nor the government prove violations of a civil regulatory statute as the sole basis for alleged criminal misapplications of bank funds."[69] This court agreed, finding

---

[68] 614 F.2d 486 (5th Cir. 1980).

[69] Id. at 489.

that bootstrapping a criminal violation to a civil violation was plain error requiring reversal.[70] Wiley contends that essentially the same thing happened here: The prosecution secured a criminal conviction by proving that the pharmacists violated TPLR standards and the standards of the regulations that it seeks to convey. The government counters that it both charged and proved a violation of the appropriate criminal statutes, not merely the related regulations.[71] It contrasts the irreproachable, commonplace use of duly issued regulations in clarifying the scope and contour of criminal laws with the inappropriate replacement of criminal laws with civil regulations. The government's distinction is sound. Even in Christo itself, this court explained that although subsequent criminal prosecutions should occur "unaided by any prejudicial reference to violations of [the civil regulation]," "this should in no way

---

[70] The court stated:

A conviction, resulting from the government's attempt to bootstrap a series of checking account overdrafts, a civil regulatory violation, into an equal amount of misapplication felonies, cannot be allowed to stand. The government's evidence and argument concerning violations of § 375a impermissibly infected the very purpose for which the trial was being conducted to determine whether Christo willfully misapplied bank funds with an intent to injure and defraud the bank, not whether Christo violated a regulatory statute prohibiting the bank from extending him credit in excess of $5,000. The trial court's instructions and emphasis on § 375a served only to compound the error by improperly focusing the jury's attention to the prohibitions of § 375a.

Id. at 492.

[71] This court's unpublished opinion in United States v. Ogle , 201 F. App'x 979 (5th Cir. 2006), rejected a similar argument and aptly explains why the argument must fail. In Ogle, a physician was prosecuted under § 841(a) for writing illegitimate prescriptions and argued that the "indictment reflects an attempt to impermissibly 'bootstrap' a violation of 21 C.F.R. § 1306.04(a) [which defines when physicians or pharmacists have impermissibly distributed controlled substances], which he characterizes as a civil regulation, into a criminal offense." Id. at 980. The court found the argument without merit, explaining that the regulation was an interpretative regulation, not a civil regulation; the indictment only charged a violation of § 841(a), and physicians can be prosecuted for prescribing drugs outside of professional practice.

preclude pertinent testimony . . . regarding the purposes and effects of overdrafting in the banking industry. This evidence should remain highly relevant on the issues of whether misapplication occurred as well as intent."[72]

No Due Process violation was worked, and the district court did not abuse its discretion in admitting the TPLR.

## D. Excluded Business Records

Wiley and Essett challenge the district court's refusal to admit certain business records from their pharmacy's computer system, maintained and organized by a computer program called Etreby. The excluded exhibits purported to represent data from the pharmacy records, broken down in such a way as to demonstrate facts favorable to Wiley and Essett's claims of innocence. The exhibits were intended to show that Herpin prescriptions accounted for a relatively small portion of I-10 East's business, supporting Wiley and Essett's argument that they had no economic incentive to join the drug conspiracy. The relatively small proportion of Herpin prescriptions also undercuts the inference that they knew of the illegitimacy of the prescriptions.

Wiley and Essett tried to use the business records exception to the hearsay rule, FED. R. EVID. 803(6), to introduce the exhibits. The exception requires that either the custodian of the business records or "other qualified witness" lay a foundation before the records are admitted. "There is no requirement that the witness who lays the foundation be the author of the record or be able to personally attest to its accuracy."[73] "A qualified witness is one who can explain

---

[72] Christo, 614 F.2d at 492 & n.7.

[73] United States v. Duncan, 919 F.2d 981, 986 (5th Cir. 1990).

the record keeping system of the organization and vouch that the requirements of Rule 803(6) are met."[74]

Each of Wiley and Essett's efforts was met with objection by the government, and the records were ultimately excluded. First, Wiley and Essett sought to call an expert, Celious Barner, to lay a foundation for the records. Barner knew the Etreby program well and had statistics training that allowed him to parse and present the large amounts of data in the records clearly. The government objected, arguing that Barner was not qualified to establish the foundation, as he had never worked at I-10 East and first encountered the relevant records in April 2005, long after they were compiled (from 2002 to 2004). The court sustained the objection. Then Wiley and Essett, themselves unwilling to testify because of Fifth Amendment concerns, suggested that Wiley's mother, Dorcas, who had worked at the pharmacy, could lay the foundation. The prosecution countered by warning that she too could have Fifth Amendment concerns, as she was still under investigation and subject to possible criminal indictment. Finally, Wiley and Essett attempted to use a business records affidavit pursuant to FED. R. EVID. 902(11) to lay the foundation, but the government objected to the affidavit as untimely.

Wiley and Essett argue that the court abused its discretion because Barner was qualified to lay the necessary foundation, or alternatively, the district court abused its discretion by not accepting the Rule 902(11) affidavit. Taking the situation as a whole, they argue that the district court's refusal to admit the records violated their Sixth Amendment right to put on a defense. (The latter objection was not made at trial and is subject to plain error review.)

---

[74] United States v. Iredia, 866 F.2d 114, 120 (5th Cir. 1989).

The district court did not err in ruling that Barner was not qualified to lay the foundation. Barner's expertise in statistics and in the computer program used did not give him any knowledge about I-10 East Pharmacy's record keeping practices. He knew about the pharmacy computer system, how to operate the system, and how to extract information from it, but that is not knowledge about the pharmacy's record keeping. The Sixth Circuit case that the appellants seek to rely on makes this point: "In order to be considered to be an 'otherwise qualified witness' under Rule 803(6), '[a]ll that is required of the witness is that he or she is familiar with the record keeping procedures of the organization.'"[75] Amidst all of his unquestioned expertise, Barner lacked this necessary familiarity.

Nor did the district court abuse its discretion in refusing to give effect to the untimely offered affidavit. The notice requirements of Rule 902(11) are in place precisely to ensure that evidence to be accompanied by an affidavit can be vetted for objection or impeachment in advance. In this case, while the exhibits in question were available in advance, the way in which the evidence was to be introduced forms part of the necessary notice and understandably gave the government pause at trial. The government quickly discovered a few small discrepancies amidst vast numbers of pages in the proffered exhibits, and accordingly, it objected to their being admitted as business records via an untimely affidavit. Contrary to Wiley and Essett's assertions, this goes not just to weight but to admissibility, as the lower court determined.

It is true that the government introduced computer printouts of some of Wiley and Essett's records, but the government's foundation cannot provide a

---

[75] United States v. Jenkins, 345 F.3d 928, 936 (6th Cir. 2003).

foundation for Wiley and Essett. The government introduced copies of records that happened to be found in Herpin's office in the course of investigation and that were used for narrow purposes, as opposed to being drawn after-the-fact from pharmacy computers and presented as reliable records over a longer period. Any inconsistency on this score does not rise to the level of abuse of discretion.

In the end, Wiley and Essett's arguments do not allay the hearsay concerns that underlie business records doctrine sufficiently for us to hold that it was an abuse of discretion for the district court to refuse to admit their records.

Wiley and Essett's Sixth Amendment argument is also without merit. Most of the relevant data in Wiley's exhibits was admitted into evidence by the government. As far as the presentation of evidence, our review of the proffered exhibits does not begin to suggest that their presentation could have in any way unsettled the clear impression that emerges from the evidence otherwise arrayed against Wiley and Essett. Their ability to make their case was not impeded by the trial court's rightful exclusion of evidence that was not admissible under the applicable rules.

## IV. TRIAL PROCEEDINGS

### A. Batson Challenge

"[I]t is a fixed part of our constitutional landscape that '[t]he use of peremptory challenges to strike venire-persons based on their race violates the equal protection component of the Due Process clause of the Fifth

Amendment.'"[76]  The appellants claim that the jury selection in their trial was tainted or may have been tainted by a violation of this principle, notably announced in Batson v. Kentucky.[77]  They ask that their convictions be overturned or remanded to the district court for a hearing to determine whether there was in fact a Batson violation.

The facts relevant to the Batson claim are as follows.  During jury selection, one black venire member was challenged for cause, a second was excused by agreement of the parties, the government used a peremptory challenge against a third (venireman 8), and one black venire member was selected to sit on the jury.  Defendants raised a Batson objection to the government's strike of venire member 8, and the court asked the government to respond.  The discussion continued:[78]

> MR. BALBONI:  As to number eight, specifically, he was struck because he reported on his jury form—
>
> . . .
>
> MR. BALBONI:  – his reported criminal arrest and conviction for resisting arrest.  Actually it's a charge on there.  We double-checked it.  He was in fact convicted for resisting arrest in 1978.  He failed to disclose on his jury questionnaire that he was also convicted of assault in July of 1992.  For both of those reasons, for one for failing to – to divulge the first one, and for both reasons the Government finds him unacceptable as a juror in this case.
>
> . . .
>
> THE COURT:  You're talking prima facie, you're talking legitimate reason.  And now it's pretext.

---

[76] United States v. Williamson, 533 F.3d 269, 274 (5th Cir. 2008) (quoting United States v. Montgomery, 210 F.3d 446, 453 (5th Cir. 2000)).

[77] 476 U.S. 79 (1986).

[78] Mr. Balboni is the prosecutor; the rest are defense attorneys.

MR. WASHINGTON: Yes, sir. I don't know whether it is in terms of a pretext or not because I don't have access to the information that they used. I would hope that they checked on everyone and not just on him, but the Government has access to computers to be able to determine –

. . .

MR. WASHINGTON: My question to counsel through the Court is whether he used the same process to run a criminal history on all 53 of the people.

. . .

THE COURT: Well, it says down here – just down here –

MR. WASHINGTON: Yeah, resisting arrest.

THE COURT: – was resisting arrest.

MR. BALBONI: That's correct.

THE COURT: So, I'm not going to ask them if they ran a check on everyone else. What I'm looking for is what I believe under the law to be a legitimate reason for making their strike. And now, it goes back to your side to show that it's a pretext.

MR. JONES: Right. However, under the United States versus Miller-El, the Court has indicated that there is probably another prong to that test to see if, in fact, the Government has used the same process for all other jurors.

. . .

THE COURT: Then again, the case of Purkett versus Elam is the seminal case on what they have to show to make a strike; and that's what we're looking at because that's a direct inline [sic] with the Batson challenge.

. . .

MR. WASHINGTON: Juror number 13 who is on the jury had a DWI in 1991 . . . .

. . .

MR. WASHINGTON: So, if they didn't strike both of them, then that's a pretext.

COURT: Wait a second. I'm not asking for a response.

MR. BALBONI: Yes, Your Honor.

MR. WASHINGTON: I'm looking to see if there are any others there. It appears from the sheets, Your Honor, that that's the only other venire person, number 13, who is similarly situated to number

eight; and the Government did not exercise a peremptory challenge as to that person actually being on the jury.

THE COURT: What other grounds do you have? What other – what else do you want to bring to my attention?

MR. WASHINGTON: Well, if they didn't run a criminal check as to everybody, then they singled him out.

THE COURT: All you need – all you need is a valid non-discriminatory reason for making the challenge; and he stated, initially, what it is. They went one extra step. So, I'm not going to inquire as to whether they did it to everyone else because that's the only one being questioned under the Batson, what is it, principle.

MR. WASHINGTON: Kathleen Rubalcaba, white female, suffers from the same disability; and they did not exercise a challenge as to her.

THE COURT: All right. Anything else?

MR. WASHINGTON: That's it.

THE COURT: Overruled.

The court offered no further explanation of its ruling. Having preserved their objection at voir dire, the appellants now renew it on appeal. "We review the district court's conclusion on whether the peremptory strikes were racially motivated for clear error."[79]

The touchstone of the Due Process right in question is "purposeful discrimination," as it was even before Batson.[80] The focus is and was on the subjective intentions of the attorney responsible for dismissing venire members.[81] But Batson and its progeny changed the proof required to

---

[79] Williamson, 533 F.3d at 274 (quoting United States v. Williams, 264 F.3d 561, 571 (5th Cir. 2001)).

[80] Batson, 476 U.S. at 90.

[81] "[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational; but whether counsel is telling the truth in his or her assertion that the challenge is not race-based." Montgomery, 210 F.3d at 453 (quoting United States v. Bentley-Smith, 2 F.3d 1368, 1375 (5th Cir. 1993)).

demonstrate, and the methods available to discover, this forbidden purpose.[82] "Batson v. Kentucky establishes a three-pronged inquiry to determine whether a peremptory challenge was based on race: First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination."[83] "Where, as here, the prosecutor tenders a race-neutral explanation for his peremptory strikes, the question of Defendant's prima facie case is rendered moot and our review is limited to the second and third steps of the Batson analysis."[84] These second and third steps "provide[] an opportunity to the prosecutor to give the reason for striking the juror, and . . . require[] the judge to assess the plausibility of that reason in light of all evidence with a bearing on it."[85] In Miller-El v. Dretke, the decision of which was announced just over two months before the beginning of trial in the instant case, the Supreme Court made clear that the evidence to be considered by the court includes, among other things, a "comparative juror analysis."[86] "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-

---

[82] See Miller-El v. Dretke, 545 U.S. 231, 267 (2005) (Breyer, J., concurring) (noting "the difficulty of finding a legal test that will objectively measure the inherently subjective reasons that underlie use of a peremptory challenge" and explaining that "Batson seeks to square this circle").

[83] Williamson, 533 F.3d at 274 (quoting Montgomery, 210 F.3d at 453 and Snyder v. Louisiana, 128 S. Ct. 1203, 1207 (2008) (internal citations omitted) (alterations in original)).

[84] United States v. Williams, 264 F.3d 561, 571 (5th Cir. 2001).

[85] Miller-El, 545 U.S. at 251-52.

[86] Id. at 241.

45

similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."[87]

The decision in the instant case turns on the contours of "comparative juror analysis." While the grounds on which the district court overruled the Batson objection are not clear, there is some indication that both the prosecution and the court failed to take the comparative features of two venire members into account: the white venire member 13, who had a DUI conviction on record, and black venire member 8, who had a resisting arrest conviction on record as well as an assault conviction that he did not report on his juror questionnaire. Both the court and the prosecutor seem to have believed that venire member 8's resisting arrest conviction alone provided a sufficient basis for him to be struck, and that his additional conviction and his lack of juror-form veracity were merely icing on the cake.[88] But since there were two venire members with criminal records, and only the black member was struck, further explanation as to any legitimate, non-racial distinction would seem necessary under Miller-El.

The appellants' Batson claim nevertheless fails, because the prosecution provided a second, legitimate reason. Venire member 8's lack of veracity on his juror form as to a second, more recent criminal conviction provides a clearly legitimate reason for the exercise of a peremptory challenge. The appellants seek to undermine this legitimate reason by inquiring as to whether the prosecution searched for additional convictions that venire member 13 might have left unreported. That is, they argue that the lower court should have forced the prosecution to disclose whether its search was discriminatory, on the theory

---

[87] Id.

[88] This seems to be indicted by the court's "[t]hey went one extra step," and the government's "[f]or both of those reasons."

that "if they didn't run a criminal check as to everybody, then they singled [black venire member 8] out" impermissibly. On the basis of Miller-El, they would have us hold that, as defense attorney Mr. Jones stated it at trial, "the Court has indicated that there is probably another prong to that test to see if, in fact, the Government has used the same process for all other jurors." Such a test would add a "discriminatory investigation" prong to Batson. While Miller-El may represent the current high water-mark in terms of evidence called for in Batson inquiries, we see no indication that mark reaches this high. As we noted, the Batson hearing is ultimately intended as a way of ferreting out discriminatory intent in the exercise of peremptory strikes – but its reach is not unbounded. For sound, practical reasons, Batson and its progeny limit the means available for discovering intent. Under the facts of the instant case, we do not believe that the court was obliged to subject the prosecutors to cross-examination or require them to turn over documents related to their investigation of venire members. Standing alone, mere allegations of discriminatory investigations or selective criminal background checks do not require further inquiry from a district court.

Admittedly, this might operate to hinder a comparative juror analysis in some cases. Although in the instant case the defense could have itself investigated other venire members' criminal records to insure that, even if the government's investigation were discriminatory, there were not any truly comparable white venire members. In other cases, the government might, as it has in other jurisdictions, rely on investigatory information as to struck members that is only available to the government and would thus operate to preclude any comparative juror analysis. This question is not squarely

presented in this case, and we decline to comment on it.[89]  In this case, the existence of another juror who had lied about his or her criminal record could have been uncovered by the defense.  It was not, and we therefore affirm the holding of the district court.

## B. Deliberate Ignorance Instruction

Contrary to the appellants' assertion, the district court's "deliberate ignorance" instruction was fully justified by the overwhelming circumstantial evidence establishing the "proper factual basis" for that instruction: "The proper factual basis is present if the records supports inferences that (1) the defendants were subjectively aware of a high probability of the existence of illegal conduct,

---

[89] Numerous cases present and discuss somewhat analogous circumstances.  See, e.g., United States v. Roan Eagle, 867 F.2d 436 (8th Cir. 1989) (discussing appropriate extent of Batson hearings); Ex parte Thomas, 601 So. 2d 56 (Ala. 1992) (reversing and remanding because strike was allegedly based on information only available to government); Gray v. State, 562 A.2d 1278, 1282 (Md. 1989) (discussing need for disclosure of reasons for strikes); Brawner v. State, 872 So. 2d 1 (Miss. 2004) ("[W]e . . . depend on the trial courts . . . to ensure that peremptory challenges based on information from outside sources is credible and supported . . . ."); McFarland v. State, 707 So. 2d 166, 173 (Miss. 1997) (quoting Lockett v. State, 517 So. 2d 1346, 1353 (Miss. 1987)) ("We decline to set any limits on the prosecutor's use of any legitimate informational source heretofore or hereafter available as to jurors."); State v. King, 546 S.E. 2d 575 (N.C. 2001) (refusing to overturn Batson determination based on rumors of reasons for venire member's father's dismissal from police department); State v. Hobley, 752 So.2d 771, 785 (La. 1999) (discussing Louisiana case law); Pye v. State, 505 S.E. 2d 4 (Ga. 1998) (approving strike based on community inquiry).  Most directly on point is a contested Wisconsin case that wound its way through state and federal courts, involving a defendant with a common name and an arguably incomplete explanation from the government.  See State v. Lamon, 664 N.W. 2d 607, 635-39 (Wis. 2003) (Abrahamson, C.J., dissenting) ("The heart of the Batson inquiry in this case, in my opinion, is the role that race played in the prosecutor's decision to seek out a police report for Bell and not for any other member of the venire. Why was Bell not treated the same as other venire members?"); State v. Lamon, 646 N.W. 2d 854 (Wis. Ct. App. 2002) (affirming lower state court on Batson issue); Lamon v. Deppisch, 2005 WL 2077337 (E.D. Wis. 2005) (denying federal habeas remedy and further Batson hearing); Lamon v. Boatwright, 467 F.3d 1097 (7th Cir. 2006) (affirming denial of habeas and Batson hearing, over a dissent).

or (2) the defendant purposefully contrived to avoid learning of the illegal conduct."[90]  It was therefore not given in error and is affirmed.

## C. Corresponding Responsibility Instruction

The judge issued a jury instruction regarding the "corresponding responsibility" of pharmacists to insure that substances are dispensed only for legitimate medical purposes.  The "corresponding responsibility" of pharmacists derives from 21 C.F.R. § 1306.04, and the district court's instruction largely mirrors this regulation.   This instruction does not, as appellants argue, constructively amend the complaint.  It clarifies the indictment's charges to help enable the jury to come to an accurate judgment.  Giving this instruction was not error.

## D.  Otufale's Proposed Instructions

Otufale's argument that the court's failure to adopt his proposed jury instructions is reversible error is offered in barely a page of his brief.  The cases and the portions of the record he cites do not support a finding that the lower court abused its discretion in refusing his instructions.

## E.  Combs's Motion to Dismiss Indictment

Combs argues that the indictment was constitutionally defective because it is based in part on regulatory implementations of the statute.   As he recognizes, this argument is foreclosed by Fifth Circuit precedent.  His attempt

---

[90] United States v. Fuchs, 467 F.3d 889, 901-02 (5th Cir. 2006) (quoting United States v. Freeman, 434 F.3d 369, 378 (5th Cir. 2005))).  See also United States v. Bieganowski, 313 F.3d 263, 288-91 (5th Cir. 2002).

to overcome this foreclosure by reference to Gonzales v. Oregon[91] is unavailing; in fact, in that case, the Supreme Court relied in part on this and similar regulations for its ruling, tacitly endorsing them as valid exercises of regulatory power.

## V.  SENTENCING CHALLENGES

### A. Conflict of Interest

On March 29, 2006, the day he was sentenced, after allocution but before sentence was pronounced, Essett filed a pro se motion asking, under FED. R. CRIM. P. 33, for a new trial.  He alleged that his attorney had a conflict of interest because he had represented Dr. Alonzo Peters, an unindicted co-conspirator.[92]  The motion noted that Dr. Peters' "prescriptions are being used to enhance the defendant's sentence on his PSR.  This makes Dr. Peters an adverse witness against Defendant Essett.  Defendant Essett could not confront the adverse witness Dr. Peters because they are represented by the same counsel . . . ."  Essett's attorney neither confirmed nor denied that he represented Peters during the sentencing hearing.  Without further inquiry, the district court

---

[91] 546 U.S. 243 (2006).

[92] In addition to supplying the written motion, he said:  "And before I'm finished, I would also like to submit a motion for ineffective assistance of counsel based on my attorney having a disqualifying conflict of interest.  My person represented me and Dr. Peters . . . My attorney Mr. Jones.  Me and Dr. Peters and is being used – Dr. Peters is being used as an adverse witness against me.  And I have a motion here I would like to file for the record."

denied Essett's motion for a new trial as untimely under Rule 33(b)(2), a ruling that we affirm.[93]

On appeal, Essett seeks to construe the motion as a request for new counsel at sentencing, or as notice of a conflict that should have triggered an inquiry into the possible conflict by the court. He also advances a request for an entirely new trial, or at least a remand for development of facts, on the basis of ineffective assistance of counsel.

The latter claim must be denied because in this case as in most other cases, the record is not sufficiently developed for this court to rule on the inadequate assistance of counsel claim on direct appeal,[94] and a remand is not the appropriate remedy for Essett if there was a constitutional deficiency on this score. If he can make out an inadequate assistance of counsel claim, Essett must pursue it in a 28 U.S.C. § 2255 habeas corpus motion.

As to his other claim: he argues that the district court erred by not holding a Garcia hearing immediately upon being informed of the alleged conflict, instead of going on to pronounce sentence.[95] Garcia hearings provide a means for a court to vindicate a defendant's constitutional right to counsel. "The Sixth Amendment right to counsel includes the 'right to representation that is free

---

[93] Nor would an argument that this falls under Rule 33(b)(1) avail him. United States v. Medina, 118 F.3d 371, 372 (5th Cir. 1997) ("In this circuit, a Rule 33 motion, filed more than seven days after the verdict and premised on 'newly discovered evidence,' is an improper vehicle for raising a claim of ineffective assistance of counsel.").

[94] See United States v. Rivas, 157 F.3d 364, 369 (5th Cir. 1998).

[95] See United States v. Garcia, 517 F.2d 272, 278 (5th Cir.1975), abrogated on other grounds by Flanagan v. United States, 465 U.S. 259, 263 & n. 2 (1984); FED. R. CRIM. P. 44(c).

from any conflict of interest.'"[96] "If a defendant chooses to proceed with representation by counsel who has a conflict of interest, a district court must conduct what is commonly known as a 'Garcia hearing' to ensure a valid waiver by the defendant of his Sixth Amendment right."[97] This court has explained that the district court "remains under a continuing obligation during the course of trial to remedy an actual conflict if it emerges."[98]

Essett made his motion on the very day of sentencing, but he argues that because this conflict was particularly relevant to his sentencing, a hearing was warranted even this late in the process. Even assuming that the timing of Essett's notice would not have doomed it, and construing it as liberally as possible since it was first made pro se, Essett's argument founders on the facts. Even if a court fails to hold a hearing, Essett must demonstrate an actual conflict of interest to merit relief.[99] "An actual conflict of interest exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing."[100] The existence of an actual conflict is far from clear (even assuming that Essett's counsel did represent Peters on such matters and at such times as could provide the foundation for an actual conflict in this case). After all, five other defendants stood alongside

---

[96] United States v. Garcia-Jasso, 472 F.3d 239, 243 (5th Cir. 2006) (quoting United States v. Vaquero, 997 F.2d 78, 89 (5th Cir. 1993)).

[97] Id.

[98] United States v. Newell, 315 F.3d 510, 520 (5th Cir. 2002).

[99] United States v. Salado, 339 F.3d 285, 291 (5th Cir. 2003).

[100] Id. (quoting United States v. Rico, 51 F.3d 495, 509 (5th Cir. 1995)).

Essett; none of their lawyers suffered under a conflict, yet none called Peters to the stand or challenged the PSR evidence concerning Peters in any materially different way than did Essett's counsel. Although Essett vehemently asserts that his counsel's interests must have been conflicted, he offers no concrete explanation of the actual conflict. No doubt the possibility of a conflict existed, but we take note only of actual conflicts, and the record is devoid of a showing necessary to unseat either Essett's conviction or sentence, or even sufficient allegations to convince us that a remand for an after-the-fact hearing is necessary.[101]

## B. Upward Departures

The appellants challenge their sentences on a number of grounds, many raised for the first time on appeal and therefore subject to plain error analysis. The upward departures of their sentences do not, as they allege, violate the United States Constitution's provision for Separation of Powers, nor were they improper on any other ground raised on appeal. In light of the crimes for which they were convicted, the evidence produced at his trial, and the reasons stated by the district judge for his sentence, we affirm their sentences as to all but the reversed counts, 28 and 32.

---

[101] See Garcia-Jasso, 472 F.3d at 243-44 (finding insufficient evidence of an actual conflict and holding that the district court did not err by not holding a Garcia hearing). United States v. Infante, 404 F.3d 376, 393 (5th Cir. 2005) (determining that a conflict of interest existed but remanding on issue of whether "conflict of interest adversely affected his performance" at trial); Salado, 339 F.3d at 292 (5th Cir. 2003) (holding that the defendant adequately alleged a conflict but the court could not determine if there was in fact an actual conflict and whether the conflict adversely affected the lawyer's performance, and thus remanding for "after-the fact" Rule 44(c) hearing).

## C. Criminal Forfeiture

Although the lower court's order of forfeiture must be adjusted as necessary to reflect the two reversed counts, appellants have failed to show any other error in this order.

## VI. ADOPTION, WAIVER, AND PRESERVATION

Our review of the record reveals that the district court appears at several points to have made statements indicating that defendants would be automatically deemed to have joined their co-defendants' objections.[102] This expedited the trial but may have misled counsel into thinking they did not need to preserve certain objections individually. For instance, several defendants appear not to have timely renewed their motions for judgment of acquittal, which would mean our review on sufficiency would be only for manifest miscarriage of justice.[103] Such failures raise significant waiver and preservation complications on appeal, and they represent alternative grounds for affirmance on many claims. Mercifully, we need not delve into the details of these problems,

---

[102] See, for instance, on November 28, 2005:

THE COURT: Without objection, everybody adopts each others' objections and comments to the Court. I assume that's clear.

Or on September 27, 2005:

THE COURT: Everybody joins in each other's objections unless otherwise noted. Okay?

Or on August 9, 2005:

MR. GLADDEN: Your honor, just for clarification of the record, since we're kind of starting over, you earlier ruled that all defendants could join in, basically, defense motions. I just wanted to put that in the record.
THE COURT: Absolutely.
MR. COGDELL: We don't need to opt in on each one?
THE COURT: No, you do not. You do not.

[103] See United States v. Salazar, 542 F.3d 139, 142-43 (5th Cir. 2008).

because our holdings as to the merits of the claims presented above allow us to assume that all appellants properly raised all issues, since the arguments were, with two small exceptions, rejected.

We note as well that some appellants seek to adopt the arguments on appeal advanced by their co-appellants and by their original co-defendant Isaac Achobe, whose case is before another panel of this court, in United States v. Achobe, No. 06-20229. Adoption of co-appellants' arguments is not without limits,[104] but again, we need not rule as to the success of this venture, because Achobe's claims are equally without merit, as to any issues relevant to any appellants in the instant case.

## VII.  EFFECT OF REVERSED COUNTS

We reverse the convictions of Brown and Combs for counts 28 and 32. We remand the case to the district court for any further sentencing proceedings made necessary by the judgment of this court.

## VIII.  CONCLUSION

For the reasons stated above, we AFFIRM as to all convictions but those related to counts 28 and 32, which are REVERSED. The sentences and any monetary penalties affected by those counts are VACATED and REMANDED to the district court for appropriate adjustments consistent with this opinion.

---

[104] FED. R. APP. P. 28(i); United States v. Harris, 932 F.2d 1529, 1533-34 (5th Cir. 1991).