**UNITED STATES of America, Appellee,**

v.

**Nathaniel COLEMAN, a/k/a "Boo Tee Coleman," Appellant.**

No. 87–1470.

United States Court of Appeals,
Third Circuit.

Argued April 15, 1988.

Resubmitted Under Third Circuit Rule 12(6)
Nov. 10, 1988.

Decided Dec. 1, 1988.

Rehearing and Rehearing In Banc Denied
Jan. 5, 1989.

Stanley Weinberg (argued), Philadelphia, Pa., for appellant.

Michael R. Lazerwitz (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before HUTCHINSON, SCIRICA and ROSENN, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Defendant-appellant, Nathaniel Coleman (Coleman), appeals from a judgment of sentence imposed after a jury found him guilty of violating 18 U.S.C.A. § 241 (West 1969) (Count I), 18 U.S.C.A. § 1503 (West 1984) and 18 U.S.C.A. § 2 (West 1969) (Count II).[1] Coleman contends that (1) the government violated the guarantees of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding certain evidence from the defendant and that we should either grant him a new trial or bar the prosecution under the double jeopardy clause of the Constitution; (2) the evidence was insufficient to support the guilty verdicts; (3) the government failed to corroborate Coleman's "confession" to its chief prosecution witness, and (4) he is entitled to a new trial on the basis of the prosecution and defense counsels' improper conduct before the jury and on the basis of the government's closing arguments. For the reasons stated below, we will affirm the judgment of sentence.

### I.

As a threshold matter, the convoluted nature of the events leading up to this appeal requires us to discuss our jurisdiction. On May 29, 1985, Coleman and Anthony Del Bono (Del Bono) were indicted on the above charges stemming from the

death of Nigel Anderson (Anderson). Anderson was found dead in a room at the Crossroads Motel, Whitpain Township, Pennsylvania, on the eve of Coleman's trial in the district court for various narcotics violations. That trial was scheduled to commence on June 2, 1980. Anderson had agreed to act as a confidential informant against Coleman. In September of 1985, Coleman and Del Bono were first tried on the indictment now appealed in the Eastern District of Pennsylvania. As to Coleman, the jury split evenly on both counts of the indictment. The jury was divided with seven guilty votes and five not guilty votes on Count I of the indictment against Del Bono. He was acquitted on Count II. The trial judge declared a mistrial on those charges upon which the jury failed to agree.

A new trial was held in December of 1985. The jury found Coleman guilty on both counts. It found Del Bono guilty only on Count I, the conspiracy charge. The trial court, noting counsels' incessant "bickering and improper actions" and finding a *Brady* violation, granted Coleman's request for another new trial. However, it denied Coleman's motion for a judgment of acquittal. Citing the lack of evidence supporting the jury's finding that Del Bono had conspired to prevent Anderson from testifying, the district court granted Del Bono's acquittal motion. It denied Del Bono's new trial motion as moot.

Pursuant to 18 U.S.C.A. § 3731 (West Supp.1988), the government appealed the order granting Coleman's motion for a new trial and Del Bono's motion for acquittal. Since Coleman's new trial motion under Fed.R.Crim.P. 33 was untimely, we held that the district court did not have the power to order a new trial. Accordingly, we reversed and reinstated the jury's guilty verdict. *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir.1987). However, we affirmed the district court's order granting Del Bono's motion for acquittal. *Id.* at 807–08. The case was then remand-

---

1. 18 U.S.C.A. § 241 makes unlawful any conspiracy "to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him." 18 U.S.C.A. § 1503 prohibits obstruction of "the

due administration of justice," and 18 U.S.C.A. § 2 forbids anyone from aiding, abetting, inducing or causing an act to be done by another which is "an offense against the United States."

ed to the district court for sentencing. On remand, the district court sentenced Coleman to a life term of imprisonment on Count I and a concurrent five year sentence on Count II. Coleman appeals the judgment of sentence.

The government's previous interlocutory appeal under 18 U.S.C.A. § 3731 seeking our review of the new trial and acquittal orders did not, at that time, give this Court jurisdiction to consider those other issues Coleman now raises on appeal. *United States v. Margiotta*, 646 F.2d 729, 734 (2d Cir.1981), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). Because Coleman has now been sentenced, we have before us a final order and appellate jurisdiction is present under 28 U.S.C.A. § 1291 (West Supp.1988). *Flanagan v. United States*, 465 U.S. 259, 263, 104 S.Ct. 1051, 1053–54, 79 L.Ed.2d 288 (1984).

Coleman's Rule 33 motion for a new trial was untimely. Accordingly, the district court only had power to consider those issues raised pursuant to his Fed.R.Crim.P. 29 motion for acquittal. *Coleman*, 811 F.2d at 807. In its answer to Coleman's petition for rehearing, the government chose not to rely on this default and agreed that the new trial issues were open on this appeal. Accordingly, we have considered them, but find they lack merit.[2]

**2.** If the district court had a timely new trial motion before it when it entered its order granting a new trial, we would review its order for abuse of discretion. Since the motion was untimely and the district court had no jurisdiction to pass on the new trial motion, *see Coleman*, 811 F.2d at 807, we must, if we have jurisdiction, decide in the first instance whether the issues raised require a new trial. Assuming we have power to review the issues, we would do so on due process grounds. In other words, we would determine whether Coleman had a fair trial within the meaning of the due process clause.

Coleman raises three new trial issues which he contends require the granting of a new trial: first, that the government withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); second, that the improper conduct of both counsel, particularly that of the government, requires a new trial; and third, that the government's attorney impermissibly expressed an opinion as to Coleman's guilt in her closing

II.

Coleman argues that the government's failure to provide him with *Brady* materials before the first trial bars the second trial under the double jeopardy clause of the United States Constitution.[3] Following the hung jury on both counts of the indictment against Coleman, the second jury found him guilty of all charges. Although the bulk of the purported *Brady* violations were remedied before the second trial, Coleman contends that the second trial should never have taken place. In other words, the new trial order was insufficient to remedy the prosecutor's misconduct in failing to provide him exculpatory evidence in satisfaction of *Brady*. This is a legal issue on which our scope of review is plenary.

The constitutional protection against double jeopardy secures a defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). That protection, however, has never been described in absolute terms. The right "is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978).[4] In the

argument. Prosecutorial misconduct merits a new trial when it materially affects the outcome. *Smith v. Phillips*, 455 U.S. 209, 219 & n. 10, 102 S.Ct. 940, 947 n. 10, 71 L.Ed.2d 78 (1982). Having reviewed the record in that light, we do not believe that either the bickering between counsel, the prosecutor's closing remarks or the *Brady* violation reached that level. For a description of the *Brady* issues, *see infra* at 459–60.

**3.** The Fifth Amendment states, in pertinent part, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

**4.** The Supreme Court reiterated this principle in *Oregon v. Kennedy*, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982) (citations omitted):

The Double Jeopardy Clause ... does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceed-

context of prosecutorial misconduct, the double jeopardy clause will not bar retrial "absent *intent* on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Oregon v. Kennedy*, 456 U.S. 667, 676, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982) (emphasis added). Here, assuming arguendo a number of *Brady* violations prior to the first trial, the double jeopardy clause is not implicated. The prosecutor's withholding of exculpatory evidence from the defendant may only be characterized as an overzealous effort to gain a conviction from the first jury and not as an attempt to subvert Coleman's "valued right" by bringing the case before a second jury. Because the double jeopardy shield against prosecutorial misconduct seeks to deny "the prosecution a more favorable opportunity to convict" the defendant, *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed. 2d 100 (1963), we do not believe the clause may be invoked to supplement the remedies contemplated by *Brady*.

The one reported decision on this issue that we have located supports this position, *i.e.*, that the double jeopardy clause may not be relied upon to remedy a *Brady* violation. The Tenth Circuit, in *United States v. Davis*, 578 F.2d 277 (10th Cir. 1978), rejected a similar request for a double jeopardy remedy to a *Brady* violation. Following a hung jury, the district court ordered a new trial. On the *Brady* issue, the court opined:

> ing. . . . If the law were otherwise, "the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again."

**5.** It is noteworthy that before extending the *Brady* right to include disclosure of impeachment evidence, the Court, in *Giglio v. United States*, 405 U.S. 150, 151, 92 S.Ct. 763, 764, 31 L.Ed.2d 104 (1972), framed the issue as follows: "We granted certiorari to determine whether the evidence not disclosed was such as to require a new trial under the due process criteria of *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)." Moreover, Justice Brennan, dissenting in *United States v. Bagley*, 473 U.S. 667, 706, 105

Assuming arguendo that nondisclosure at the first trial of the note written by Andrus was indeed a violation of the principles laid down in *Brady*, the most an invocation of *Brady* could accomplish would be the ordering of a new trial in which the withheld information is fully disclosed. The second trial of Mr. Davis, which is the case on appeal before us, in effect afforded him the new trial remedy prescribed by *Brady*. In this fact situation, defendants' claim that the second indictment and trial subject Mr. Davis to double jeopardy is simply contrary to long established precedent.

*Id.* at 280.

Careful scrutiny of *Brady* and its progeny lend further support to this approach. *Brady* itself addressed a prosecutor's failure, in a capital case, to disclose to a defendant a co-defendant's admission to commission of the actual homicide. In defining the due process right impinged by the prosecutor's failings, the Court noted that the aim of due process "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197. *See also Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982) (touchstone of *Brady* due process analysis is fairness of trial, not culpability of prosecutor).[5] Unlike the double jeopardy analysis, which places a premium upon the defendant's right to one prosecution, due process simply requires that the defendant be treated fairly. The awarding of a new trial to remedy a *Brady* violation

S.Ct. 3375, 3396, 87 L.Ed.2d 481 (1985) (Brennan, J., dissenting), characterized the *Brady* remedy as "[t]he defendant's entitlement to a new trial." These statements are consistent with the view that the *Brady* remedy is indeed a limited one. A qualitative analysis of the government's misconduct in *Brady* demonstrates that the Supreme Court has never felt compelled to bar a prosecution as a result of improper withholding of evidence. Despite the gravity of the prosecutor's error in *Brady*, *i.e.*, the withholding of key exculpatory evidence in a capital prosecution, the Supreme Court limited its remedy to a new trial on the issue of punishment alone. Mindful of the Supreme Court's reluctance to supplement the *Brady* new trial remedy with the more draconian remedy of acquittal, we decline to do so on the facts of this case.

insures that the defendant will be able to make full use of the exculpatory evidence during the subsequent proceeding. Additionally, such a limited remedy furthers the societal interest in prosecuting criminal defendants to conclusion.

In the instant case, Coleman asserts that the government's failure to provide him with certain *Brady* materials prior to the first trial mandates that we bar the second trial and conviction as violative of the double jeopardy clause. As discussed above, the new trial, ordered as a result of the hung jury, provided Coleman an opportunity to utilize the exculpatory evidence that he contends was impermissibly withheld. At both trials, Haywood Logan testified that Coleman told him he had Anderson killed. All of the alleged *Brady* violations surround impeachment evidence to be used to undermine Logan's credibility. Our review of the record convinces us that defense counsel had access, at the second trial, to all of the material impeachment evidence Coleman claims the government denied him.[6]

First, Coleman asserts that the government's withholding of the details surrounding Logan's 1981 and 1983 plea agreements violated *Brady*. At the first trial, Logan was recalled to the witness stand after defense counsel located, during the course of the trial, potential impeachment evidence in the district court clerk's office. This information undermined Logan's initial assertions that the 1981 agreement was not made pursuant to a plea bargain and that his potential criminal liability in 1983 was limited to only five years imprisonment. Since the details of the 1981 and 1983 plea agreements were uncovered at the first trial and used extensively at both trials, we cannot conclude that the government's failure to disclose this information prior to the first trial warrants additional relief.

Second, Coleman contends that the prosecution's failure to disclose, prior to the first trial, the transcripts of Logan's testimony in an unrelated proceeding, *United States v. Dolan*, requires our barring of the second trial. In *Dolan*, Logan testified on behalf of the government to illegally obtaining prescriptions for narcotics from Dr. Dolan. Coleman sought to tarnish Logan's credibility by demonstrating Logan's continuing relationship with the government despite an ongoing pattern of illicit activity. The *Dolan* transcript was made available to defense counsel prior to the second trial and was heavily relied on for impeachment purposes in the second proceeding.

The government's failure to turn over to the defense a copy of a proffer letter, offering limited immunity to Logan in exchange for his cooperation in the Coleman prosecution, is the next alleged *Brady* violation.[7] At the second trial, defense counsel elicited the details of the letter from a prosecution witness. On appeal, Coleman says that he should have had access to the letter itself before the first trial.

Defense counsel made effective use of the proffer letter before the second jury despite the fact that he was not provided a copy until prior to appeal. Indeed, the prosecution witness suggested on cross-examination that the letter afforded Logan total immunity from prosecution for information provided pursuant to the agreement. However, the express terms of the document allow the government to make derivative use of any statements made under the proffer letter. We fail to see how access to the letter itself could have further benefited Coleman.

Lastly, we do not believe that the transcripts of *in camera* discussions surrounding Logan's 1983 plea agreement and sentencing constitute *Brady* material. Defense counsel was fully aware of the terms of the plea agreement and made extensive use of that information when attempting to undermine Logan's credibility at both tri-

---

**6.** The record does suggest that the government acted without regard to its *Brady* obligation before the first trial. We therefore analyze each piece of impeachment evidence to demonstrate its availability to defense counsel for use before the second jury which ultimately convicted the defendant.

**7.** The government, in its brief, asserts that it had in fact turned over to defense counsel a copy of the letter in a timely fashion. Appellee's Brief at 25. In light of our resolution of this issue, we need not resolve this factual dispute.

als. Our review of the entire record convinces us that access to the plea colloquy and sentencing hearing would not have provided Coleman with any additional impeachment evidence. Moreover, the representations of counsel made at the hearings would be of dubious admissibility in an unrelated criminal trial. Absent a showing that the withheld evidence is material, no *Brady* violation exists. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

■ In sum, the granting of a new trial following the hung jury did not violate the protections of the double jeopardy clause. The Supreme Court has long recognized the "manifest necessity" of retrial following a hung jury. *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). When reviewing the ordering of a mistrial after a jury is hung, "[w]e will afford great deference to the trial court's discretion." *Crawford v. Fenton*, 646 F.2d 810, 817 (3d Cir.), *cert. denied*, 454 U.S. 872, 102 S.Ct. 344, 70 L.Ed.2d 178 (1981). The trial court properly inquired of the jury in the first trial as to whether a verdict could be reached. After assurances from the jurors that further deliberations would prove fruitless, the jury was discharged. We find no abuse of discretion in the ordering of a new trial. The ordering of a new trial remedied the purported *Brady* violations to the extent, if any, that a remedy was necessary.[8]

### III.

■ Coleman challenges the sufficiency of the evidence adduced at both trials. A successful challenge to the first trial on a sufficiency basis would, of course, bar the subsequent trial on double jeopardy grounds. However, we need not now consider the sufficiency of the government's case at the first trial. The Supreme Court has stated that "a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected.... Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial." *Richardson v. United States*, 468 U.S. 317, 326, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984).[9] Accordingly, our task is limited to considering the sufficiency of the evidence at the second trial.

The scope of our review of factual determinations is quite limited. "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). *See also United States v. Riccobene*, 709 F.2d 214, 222 (3d Cir.) (applying *Glasser* standard in affirming jury verdict), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). In the course of conducting this inquiry, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*,

---

**8.** We do not suggest that the government's conduct in withholding *Brady* materials could never be sufficiently egregious to bar prosecution of a defendant on due process grounds. *See generally United States v. Driscoll*, 852 F.2d 84 (3d Cir.1988). Coleman does not raise the argument and we see no basis for affording him relief on this basis. Coleman, in addition to arguing that the sum of the *Brady* violations implicates the double jeopardy clause, argues in the alternative that a second new trial is warranted on the same basis. Since his new trial motions were untimely, we would not ordinarily reach this argument. However, because of the government's concession we have considered it and hold it lacks merit. *See supra* at 456.

**9.** In his brief, Coleman points out discrepancies between Haywood Logan's testimony at the two trials. He argues Logan refined his testimony during the second trial. After *Richardson v. United States*, 468 U.S. 317, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), the strengthening of the prosecution's case at the second trial does not offend the double jeopardy clause. *United States v. Kimberlin*, 805 F.2d 210, 230–31 (7th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987). We have examined the record and conclude that there are no material differences, for sufficiency purposes, between the evidence the government presented at the first and second trials.

443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Reviewing the record under that standard, we believe that the second jury had before it evidence which supported its verdict.

■ On June 2, 1980, Coleman's trial for various federal narcotics offenses was scheduled to begin. In satisfaction of its discovery obligations, the government apprised Coleman's counsel of the fact that the victim, Anderson, was to testify as a confidential informant against Coleman. While purchasing heroin from Coleman, Anderson had worn a body wire to record the transactions. On Friday, May 30, Del Bono, Coleman's business partner rented room 21 at the Crossroads Motel.

The next night, May 31, around 12:00 a.m., Anderson left his Norristown apartment with Coleman's girlfriend, Francine Dyson. Earlier that same evening, Robert Fisher, described by Haywood Logan, the prosecution's chief witness, as Coleman's "enforcer," checked into room 18 at the Crossroads Motel. Debra Roberts, who spent that night with Fisher in room 18, testified that between 12:00 and 12:30 in the morning on June 1, Fisher received a phone call and stated to the caller "Don't worry, everything will be taken care of." Fisher then left the room, ostensibly to purchase a soda. After a one-half hour absence, Fisher returned to the room. He immediately retired to the bathroom to change his clothes. Ms. Roberts observed that Fisher had placed a towel on his hand to stem the flow of blood from a cut. Shortly thereafter, Fisher received another phone call and stated: "Don't worry, everything has been taken care of." At approximately 8:00 a.m. on June 1, a motel employee discovered Anderson's body in room 21. An autopsy revealed that he died of multiple stab wounds.

Haywood Logan, also Coleman's confederate in a number of narcotics sales, testified that Coleman introduced Fisher to him as his "enforcer." Coleman also warned Logan to be wary of Anderson because he was a "rat." Before Anderson's death, Coleman told Logan that he would have to have Anderson "taken care of." After Anderson's body was discovered, Coleman traveled to Logan's Pottstown bar to celebrate. Logan testified that Coleman told him he was "back in business" and could "beat [his] case." Moreover, Coleman stated to Logan that Coleman had his "main man," Robert Fisher, take care of Anderson. Examination of the entire record, and not limited portions as Coleman would have it, satisfies us that the jury verdicts were supported by substantial evidence.

### IV.

■ Lastly, Coleman asserts that the record evidence does not sufficiently corroborate his statement to Logan after Anderson was killed and therefore that statement is an uncorroborated confession insufficient to sustain a conviction. *See, e.g., Government of the Virgin Islands v. Hoheb*, 777 F.2d 138, 141–42 (3d Cir.1985) (applying rule in *Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954) that to support a conviction, defendant's post-crime admissions must be corroborated). Again, we disagree. Logan's recitation of Coleman's admissions dovetails with the evidence adduced by the other witnesses and is circumstantially corroborated by it.

Based on the foregoing, the judgment of the district court is affirmed.