# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 18, 2008

Charles R. Fulbruge III
Clerk

No. 06-20229

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ISAAC SIMEON ACHOBE

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before KING, HIGGINBOTHAM, and WIENER, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Isaac Simeon Achobe was a pharmacist convicted with a number of others for their involvement in the illegal distribution of drugs. Achobe was convicted alongside five fellow pharmacists. His timely appeal was severed from his co-defendants. Their appeal has been decided this day by a different panel of this court, in United States v. Brown, No. 05-20997. We rely on the factual recitation from that opinion, supplementing it with details relevant to Achobe.

## I. BACKGROUND AND FACTS

The background of the conspiracy is this. On the suggestion of Achobe, Dr. Callie Herpin opened a pain management clinic in Houston, which soon evolved

into a "script mill" that did little more than unlawfully sell prescriptions for controlled substances. Achobe and his co-defendants at trial were pharmacists who filled these prescriptions. For this case, the two most important drugs that Herpin wrote scripts for are promethazine with codeine, a Schedule V drug that treats coughs and nausea, and hydrocodone, a Schedule III pain killer. Both are known to have a high risk of abuse. Promethazine with codeine, often referred to as "purple" or "syrup," is a major street drug in the Houston area, and hydrocodone is a powerful, potentially addictive opioid narcotic, marketed under many names (Vicodin is one acetaminophen-hydrocodone blend), and sometimes, on the street, taken in combination with syrup and other drugs.

Drug dealers bought prescriptions from Herpin and at least three other doctors, sometimes in large quantities at a time. The dealers filled the prescriptions at pharmacies – usually independent pharmacies with whom they had long-term relationships, because most mainstream pharmacies will not fill prescriptions for these drugs, especially in often-repeated and large quantities. The dealers paid with large amounts of cash and then sold the drugs on the street.

The charged conspiracy period ran from around October 2002 to December 2003. The conspiracy had its origins in a 2002 conversation between Herpin and Achobe. Since 1997, Achobe had owned and run a Houston pharmacy called American Choice Home Healthcare Pharmacy.[1] Herpin, a doctor since 1998, was at the time working part-time at a pediatrics clinic in the same building as American Choice. She told Achobe she was unhappy with her job, because it required long hours and offered too little pay. Achobe recommended that she enter the "pain management" business and referred her to some of his acquaintances who were "pain management specialists," Dr. Peters and Dr.

---

[1] Achobe immigrated from Nigeria in 1978 and has been a licensed pharmacist since 1983.

Gbanaador. Achobe gave her advice about running a "pain management" practice and said that he could send "patients" to her (at least thirty to forty percent of Achobe's business involved filling prescriptions from "pain management" doctors). Herpin soon went from writing small numbers of prescriptions for individuals to selling scripts with information drawn from lists of fictitious patients with corresponding prescriptions. The government says that the co-conspirator pharmacists were in on the fix; they would accept large cash payments, and fill suspiciously large quantities of drugs and numbers of prescriptions for dealers who would in many cases come in repeatedly with scripts filled out in many different individuals' names. Achobe himself spurned some of the more egregious of these practices.

Herpin came to the attention of the DEA, eventually pleading guilty to conspiracy to distribute illegally narcotics and to Medicare fraud. Herpin was also writing illegal prescriptions for wheelchairs to further her Medicare fraud, but these defendants were not involved in that activity. Herpin, a pharmacist named Daryl Armstrong, a drug-dealer-turned-Herpin-employee Etta Williams, and other drug dealers, all testified for the government.

A grand jury returned a 121 count indictment against Achobe and others in September 2004. A 190 count superceding indictment issued in November 2004, and the case went to trial. The jury hung and the court declared a mistrial. The grand jury returned an 82 count second superceding indictment after the mistrial. In addition to drug distribution and conspiracy counts, Achobe faced six counts of aiding and abetting money laundering promotion in violation of 18 U.S.C. § 1956(a)(1)(A)(i). In addition to Achobe and other pharmacists, the second superceding indictment charged three co-conspirators who either pled guilty or were convicted in separate trials.[2] Achobe and five

---

[2] The other defendants included three drug dealers. Two pled guilty. The third went to trial, was convicted, and had his conviction affirmed by this court.

pharmacist co-defendants went to trial again. The trial began on August 16, 2005, and the prosecution rested on September 15. Defense rested on September 27.

The trial centered on knowledge: did the pharmacists know they were filling illegitimate prescriptions? The prosecution's evidence was mostly circumstantial. There was testimony that the amounts of drugs being prescribed were unusual, as were the refill authorizations. The drug dealers who purchased the prescriptions would have multiple prescriptions filled at a time, and the prescriptions were often nearly identical. The same drug dealers were making numerous trips to the same pharmacies within short periods of time. And, everything was done in cash.

On October 4, 2005, Achobe and his co-defendants were convicted of all offenses with which they were charged. On February 28, 2008, the district court sentenced Achobe to 63 months of imprisonment and levied monetary penalties on him. He raises a number of grounds on appeal.

## II. SUFFICIENCY OF ILLEGAL DISTRIBUTION EVIDENCE

### A. Evidence at the Second Trial

Achobe challenges the sufficiency of the evidence supporting the jury verdict convicting him of illegal drug conspiracy and distribution.

The standard for a sufficiency claim is high. "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."[3] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational

---

[3] United States v. Bryan, 896 F.2d 68, 74 (quoting Glasser v. United States, 315 U.S. 60, 80 (1942)).

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[4]

In making his sufficiency argument, Achobe seeks to draw a clear line between his co-defendants and himself. He acknowledges that the evidence against his co-defendants is sufficient, even overwhelming, and he seeks to contrast this with the evidence against him. Indeed, their overall quantity of hydrocodone purchases is huge compared to his. They filled many more Herpin prescriptions. Achobe notes that he filled "only a handful of Dr. Herpin's prescriptions–on average, about one or two a day over the course of a year." Government witnesses testified that Achobe would not fill prescriptions from lists and was known for "being law-abiding and doing things by the book and not breaking laws." Achobe points out that in the course of the undercover investigation of Herpin and her conspiracy, he refused to bend the rules for the undercover officer who urged him to refill a prescription early. In the officer's initial visit, she recorded Achobe asking her the typical questions and giving the typical warnings of pharmacists before distributing medicines.

In fact, at the time of his first conversation with Herpin, Achobe was not doing business with one of the "pain management" doctors he pointed her to, because that doctor had not provided him with sufficient documentation for some prescriptions. Achobe presented documentation demonstrating that he called doctors to confirm many prescriptions, or even cancelled prescriptions and notified doctors when their patients were seeking prescriptions from multiple providers for the same medical problems. He had firm rules regarding when he would let individuals pick up prescriptions on the behalf of others.[5] He had even

---

[4] Jackson v. Virginia, 443 U.S. 307, 319 (1979).

[5] Before allowing representatives to pick up prescriptions, Achobe required the named recipients of prescriptions to appear in person and sign an authorization allowing their agent to pick up prescriptions in their name. However, the policy was hardly airtight: one drug dealer who pled guilty and turned government witness, Omar Fahie, had authorization from

aided previous federal and state narcotics investigations – DEA once set up a controlled delivery and arrest in his pharmacy.

Furthermore, once Herpin's script mill was operating, Achobe questioned Herpin about the quantities of her prescriptions, at one point he told her to "tone it down," and ultimately he refused to fill any more of Herpin's prescriptions. In the first trial, Herpin confessed that she was "surprised" he had been criminally charged, because he "[n]ever suggest[ed] [that she] break any laws" and was merely "trying to help a young doctor get started in the business"; she testified that "if [she] had followed [Achobe's] advice," she "would not be guilty." She admitted that Achobe did not know of more clearly illicit advice given to her by Dr. Peters, one of the doctors he had recommended that she speak to.[6] Nonetheless, she testified that she had "assumed" that there was an illegal element underlying his advice.

Achobe finds this last point "confusing[]." It need not be. Achobe's business practices were different from, and ultimately incompatible with, some of his co-conspirators. In Herpin's testimony, as throughout the record, there is evidence consistent with Achobe's being a law-abiding pharmacist – or with his being a careful criminal. It is reasonable for Herpin to have "assumed" that Achobe was suggesting that she join an illegal drug distribution conspiracy but carefully observe the superficialities of legal "pain management" practice in order not to get caught. He gave her such advice as: "[D]on't write prescriptions for people that didn't exist," "don't do lists," and don't write "large quantities." This litany of advice, while perhaps innocuous on its face, is hardly incompatible

---

sixteen individuals. Achobe's brief trumpets the testimony by Fahie and another witness, Sharon Boutte, that Achobe insisted on filling prescriptions for "real people." But scripts written for and picked up by "real people" can still be illegitimate, and filling them while knowing they are illegitimate remains illegal.

[6] The advice included: make sure patients are not wearing wires, accept only cash, and look out for marked bills.

with criminal intentions. A legitimate pharmacist, giving advice to a legitimate doctor, need not tell her not to invent patients. These pieces of advice could be interpreted, together, as evidence of an illegal conspiracy; they are the equivalent of one schemer telling another, "make sure you only fill out false claim forms on behalf of real people; fill out the forms thoroughly; and don't make the claims unreasonably large."

In addition to testimony, there was much other evidence before the fact-finder, certainly enough to support the verdict. This evidence includes large cash payments and the dispensing of highly unusual quantities of drugs extremely prone to abuse to drug dealers. The total scripts from Herpin alone that were filled by Achobe in the course of the charged conspiracy amount to over six hundred. In light of the testimonial and documentary evidence arrayed against Achobe, it strains credulity to argue that Achobe could have been unaware that he was filling prescriptions written for an illegitimate purpose.

Achobe claims that the jury in his first trial deadlocked 8-4 in favor of acquittal, and the government thereafter offered him a favorable plea, a misdemeanor with six months, a deal he refused, over the advice of counsel. He attributes the different result in his second trial to the fact that the government's prime witness, the ringleader of the conspiracy, Callie Herpin, "changed critical elements of her story." At the first trial she was uncertain over who brought up pain management during her first conversation with Achobe, but at the second trial she expressed certainty that it was Achobe. She also testified at the second trial that he had told her, when she expressed surprise that doctors would prescribe promethazine with codeine for pain (when it was usually prescribed for cold-like symptoms): "[I]t made people high and it made them, I guess, act – slow down or something and they put it in soda." She said that Achobe had told her not to allow payment by insurance, although she had first testified that another conspirator, Dr. Peters, gave her this advice. She also

7

testified, as she had not done in the first trial, that some of her early patients said they were sent by Achobe. According to Achobe, the "[m]ost remarkable" change is that she recounted a phone conversation, not reported her first time on the stand, in which when Achobe called her about her quantities and she confirmed them, he refused to fill them, saying: "No. You are a rogue doctor. I will not do [it]," and hung up. After that alleged conversation, Achobe continued to fill her prescriptions for several months. This last piece of evidence was, Achobe argues, highly prejudicial.

At trial, Achobe tested Herpin's credibility before the jury. Given the extent of Herpin's confessed criminality, of course, her credibility was already impaired. Despite Achobe's zealous testing of the evidence against him, the fact-finder found him guilty beyond a reasonable doubt, and we determine that there was sufficient evidence supporting Achobe's conviction.

## B. Evidence at the First Trial

Achobe claims that the government put on a much weaker case during his first trial than it did during his second. Accordingly, he seeks to renew his motion for a directed verdict on the insufficiency of the evidence – from his first trial. He claims that the district court erred in not granting this motion when it was first made. He points out that he could not appeal this error at the time because the Supreme Court has forbidden interlocutory appeals on sufficiency, even after a case has gone to mistrial, and he argues this court should correct the district court's error on his appeal of the sufficiency of the evidence in his first trial. The argument is that the district court ought to have directed a verdict before the second trial. We turn to this complex issue, which is clearly settled in this circuit. The issue is whether at this stage – on appeal from a conviction secured in the trial following a mistrial – Achobe can challenge the sufficiency of the evidence at that first trial.

As we will explain, ultimately this issue turns on the simple proposition that there must be a termination of the first jeopardy before there can be a second. The Supreme Court's decision in Richardson v. United States guides our analysis.[7] In Richardson, the defendant moved to bar his retrial after one count of his first trial ended in a mistrial, on grounds that the retrial would violate his Fifth Amendment Double Jeopardy Clause rights. The Court rejected the contention, concluding that "the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy. . . . [T]he failure of a jury to reach a verdict is not an event which terminates jeopardy."[8]

In United States v. Miller,[9] when their first convictions were reversed on appeal for defects in the indictment and jury instructions, defendants claimed a jeopardy bar of retrial, pointing to insufficiency of evidence. The panel considered itself bound by Richardson, despite the differences in posture: "We recognize that Richardson was an appeal asserting a double jeopardy claim which followed a mistrial [as opposed to an appellate reversal], but its holding is clearly not limited to such cases. It refuses to extend Burks [which did allow for application of the Double Jeopardy Clause to prevent retrial, when the appellate court reached and overturned a conviction on insufficiency grounds] beyond instances in which the appellate court in fact reversed for insufficient evidence. . . . The central concept of Richardson is that there is no double jeopardy unless the original jeopardy has terminated . . . ."[10] The panel's

---

[7] 468 U.S. 317 (1984).

[8] Id. at 325 (citations omitted).

[9] 952 F.2d 866 (5th Cir. 1992).

[10] Id. at 872. There is an outlying footnote in Miller noting that no further interlocutory appeals on double jeopardy claims could be heard by the circuit court, and thus these issues "will not be appealable before final judgment in this Circuit." Id. at 872 n. 5.

9

reasoning and conclusion about Richardson are compelling. "Following Richardson, we hold that double jeopardy does not bar this retrial, and because under Richardson jeopardy has not terminated, double jeopardy will not be available as a ground for challenging any subsequent conviction that may result."[11]

Achobe counters that Richardson and Miller do not apply. The key difference between Richardson and his case is that Richardson arose on an interlocutory appeal before the second trial commenced. Rather than seeking to prevent re-trial by interposing his double jeopardy claims, he looks to renew his challenge to the district court's ruling on a motion that has only now become appealable, since judgment is final. He claims that it should be granted, and his conviction invalidated. He cites cases decided before Richardson,[12] most importantly United States v. Wilkinson.[13] Wilkinson held that in a situation directly analogous to the instant case, the defendants could challenge the sufficiency of their first-trial evidence, and that the evidence was sufficient. The panel cited Abney v. United States,[14] which allowed for interlocutory review of a district court's rejection of double jeopardy claims. The Wilkinson panel reasoned: "If the trial court had granted defendants' motions for acquittal on the conspiracy charge because the evidence was insufficient during their first trial, their retrial on that count would have been precluded."[15]

---

[11] Id. at 874.

[12] See, e.g., United States v. Rey, 641 F.2d 222 (5th Cir. 1981); United States v. Becton, 632 F.2d 1294 (5th Cir. 1980).

[13] 601 F.2d 791 (5th Cir. 1979).

[14] 431 U.S. 651 (1977).

[15] Wilkinson, 601 F.2d at 794.

In theory, Richardson might not foreclose an appeal of the denial of a motion for directed verdict for insufficiency of the evidence at the first trial when the second trial has concluded and the defendant has an appealable final judgment in hand. While superficially appealing, this reasoning conflicts with Richardson. As Miller noted, Richardson limits Burke's application to its particular procedural posture. Where a conviction is actually overturned for sufficiency, there can be no second trial. But where the conviction is not finally attained, for instance with a hung jury, or where, as in Miller, it is overturned on grounds not implicating sufficiency,[16] there is no jeopardy bar, because in such cases, as Richardson teaches, jeopardy never ceased.[17]

The predominance of the case law from other circuits supports our application of Richardson. In United States v. Willis,[18] a case identical in procedural posture to the instant case, the Tenth Circuit held that Richardson led to the conclusion that after a conviction in a second trial, a sufficiency motion from the first trial could not be appealed. Richardson did not allow for examination of the sufficiency of the defendant's first trial because "'[r]egardless of the sufficiency of the evidence at [the defendant's] first trial, he has no valid double jeopardy claim to prevent his retrial.' . . . We therefore hold that

---

[16] "[I]t is abundantly clear that a reversal for instructional error is no more a termination of jeopardy than a mistrial where the jury is unable to agree." Miller, 952 F.2d at 872. For this reason, Miller suggested: "Although not mandated by the double jeopardy clause, it is . . . clearly the better practice for the appellate court on an initial appeal to dispose of any claim properly presented to it that the evidence at trial was legally insufficient to warrant the thus challenged conviction." Id. at 874.

[17] The Richardson Court acknowledged that under Abney, the interlocutory appeal was properly before it, but it declared that sufficiency arguments could no longer be raised interlocutorily as an attempt to evade a second trial following a mistrial, because they could not be successful. They were no longer colorable double jeopardy claims and thus no longer protected by Abney.

[18] 102 F.3d 1078 (10th Cir. 1996).

defendant may not resurrect his motion for acquittal at his first trial."[19] A First Circuit panel, in United States v. Julien,[20] applied Richardson to an appeal also directly analogous to Achobe's appeal in the instant case. The Julien court cited Richardson and declared that no double jeopardy argument was available. It went on to consider whether there is some other "due process or non-constitutional claim" that the sufficiency of the evidence from the first trial should be appealable after a conviction in a subsequent trial, but did not find one.[21] Finally, a Third Circuit panel relied on essentially the same reasoning in United States v. Coleman.[22] The panel noted: "A successful challenge to the first trial on a sufficiency basis would, of course, bar the subsequent trial on double jeopardy grounds."[23] The panel held that Richardson foreclosed this route; first-trial sufficiency of the evidence was not appealable.

Achobe points to United States v. Recio,[24] in which a divided panel of the Ninth Circuit reversed and remanded a procedurally complicated case for a new trial, the third in that case, after upholding the sufficiency of the evidence at the first trial.[25] The panel distinguished between the situation in Richardson, in

---

[19] Id. at 1081 (alterations in original) (quoting Richardson, 468 U.S. at 326).

[20] 318 F.3d 316 (1st Cir. 2003).

[21] It articulated a possible argument: "[T]here is a final appealable judgment after a conviction at the second trial, and [the defendant] may then appeal otherwise non-final rulings when he appeals from the judgment of guilt." Id. at 321. The panel asserts that language in Richardson is "inhospitable" to such a claim, and that "inhospitality," it said, governs. It did not specify the language, but it cited the majority at 326 and Justice Stevens' dissent at 334-35.

[22] 862 F.2d 455 (3d Cir. 1988).

[23] Id. at 460.

[24] 371 F.3d 1093 (9th Cir. 2004).

[25] Because of the procedural posture, the issue was properly before that panel on a final judgment, and thus is analogous to the instant case.

which an interlocutory appeal on Double Jeopardy Clause grounds was the basis for the challenge, and the situation in which the challenge came after a final judgment had been rendered. Reading Richardson narrowly to address mainly jurisdictional or timing issues, the panel decided that it could review the first-trial sufficiency.[26] Even so, their interpretation of Richardson was not dispositive, as they found there was sufficient evidence and remanded for a new trial.

We decline to follow the Recio court. Supreme Court and Fifth Circuit precedent, as well as the precedent of other circuits, support the view that where a first trial has ended in a mistrial due to a hung jury and a second trial leads to a conviction, the sufficiency of the evidence presented at the first trial cannot then be challenged on appeal.

## III. LIMITATION ON CROSS-EXAMINATION

Before the second trial in this case began, the government moved to "prevent defense counsel from soliciting testimony regarding whether the government investigated non-African American pharmacists in connection with the investigation of this case."[27] The court granted this in limine motion, and at

---

[26] Richardson held that a second trial following a hung-jury mistrial does not violate the Double Jeopardy Clause if, at the time the second trial begins, no court has ruled the government's first-trial evidence insufficient. . . . Richardson also held that appellate courts may no longer exercise jurisdiction over interlocutory insufficiency appeals taken before a second trial has begun. . . . Neither of these holdings affects our review here, however, because we do not consider appellants' first-trial insufficiency argument in order to decide whether the second trial violated the Double Jeopardy Clause. We address an entirely different question: whether these defendants may be prosecuted at a third trial if the government presented insufficient evidence at the first.

Id. at 1104-05.

[27] At the first trial, defense counsel adduced evidence that there was a pharmacy run by a white pharmacist that was in the same building at Achobe's pharmacy, that it filled ten times as many hydrocodone prescriptions as Achobe's pharmacy, and that the DEA agent who investigated Achobe did not investigate this other pharmacy. At the second trial, evidence

13

trial, when defense counsel asked a government investigator whether there were "any pharmacists that [she] secured Callie Herpin's dispensing records from that were not owned by minorities," the court sustained an objection and told defense counsel to "stay away from this area."

Achobe claims that the prohibition of race-based questions violated his Sixth Amendment Confrontation Clause rights. "[T]rial judges retain wide latittude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[28]

The standard of review for this claim is harmless error,[29] and any error on this score is harmless, given the amount of evidence produced by the prosecution.[30] The investigation was limited and straightforward, and the connection between Achobe and Herpin sufficiently compelling, given their early conversation, that the DEA's chosen focus of the investigation is reasonable. As to other defendants, there are also strong connections, and those pharmacies

---

emerged that this same pharmacy filled many prescriptions for Callie Herpin. Investigators offered race-neutral explanations: that the pharmacy "later closed down" and thus was no longer of interest; and the pharmacy was investigated, although no charges were brought, by another investigator. We need not look further into this issue.

[28] Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

[29] Id. at 684. Although the government does not straightforwardly claim this particular error was harmless, under these circumstances the court would choose, as it may, to apply harmless-error analysis. See Nelson v. Quarterman, 472 F.3d 287, 331-332 (5th Cir. 2006) (en banc) (Dennis, J., concurring in the judgment) (approving and elaborating on this doctrine); United States v. Vontsteen, 950 F.2d 1086, 1092-93 (5th Cir. 1992) (favorably citing other circuits' precedent on sua sponte harmless-error analysis).

[30] See, e.g., United States v. Hitchmon, 609 F.2d 1098 (5th Cir. 1979) (remanding for new trial where strong evidence suggested expansive cross-examination restriction was severely prejudicial, as it crucially impaired the defense's testing of the credibility of witness testimony at the heart of the prosecution).

filled vast numbers of Herpin prescriptions. Achobe has failed to demonstrate a relevant bias, and we find no error.

We do not reach the question of whether Achobe properly objected to the evidentiary ruling, and whether Achobe sought simply to demonstrate witness bias or sought to make out a concededly incomplete selective prosecution claim.[31]

## IV. MONEY LAUNDERING

### A. Sufficiency of money laundering evidence

#### 1. Reversal of counts 20 and 25

The government concedes that it did not present evidence sufficient to support two of the money laundering promotion counts for which Achobe was found guilty, counts 20 and 25. For one of them the government adduced evidence of only a misdemeanor, when the underlying crime must be a felony to trigger the money laundering statute. For the other crime, the government failed to introduce the evidence supporting the count altogether. These counts are therefore reversed.

#### 2. Proceeds

Achobe argues that the money used to promote further illegal activity did not involve the "proceeds" of specified unlawful activity as required under the money laundering statute as it was recently interpreted in the United States Supreme Court in United States v. Santos.[32] We resolve this issue in the decision issue this day in the appeal of Achobe's co-defendants. There we

---

[31] See United States v. Abboud, 438 F.3d 554, 579-80 (6th Cir. 2006) (discussing this distinction).

[32] 128 S. Ct. 2020 (2008).

explain that even if the more stringent definition of "proceeds" in the statute applies, the proof adduced by the government in this case against Achobe and against his co-defendants is sufficient.

### 3. Promotion

Santos dealt primarily with the "proceeds" element of the money laundering promotion crime, but the "promotion" element requires attention as well. The issue is what type of activities the transactions must "promote" in order to support money laundering promotion charges.[33]

This circuit has held that certain expenditures, even if tainted monies are used for them, will not suffice to support money laundering charges. We read the money laundering promotion statute to require "specific intent" to promote a specified unlawful activity with ill-gotten gains, and not simply to spend those ill-gotten gains. In United States v. Brown, the court warned:

> We have previously stressed the importance of not turning the money laundering statute into a money spending statute . . . . Strictly adhering to the specific intent requirement of the promotion element of § 1956(a)(1)(A)(i) helps ensure that the money laundering statute will punish conduct that is really distinct from the underlying specified unlawful activity and will not simply provide overzealous prosecutors with a means of imposing additional criminal liability any time a defendant makes benign expenditures with funds derived from unlawful acts.[34]

---

[33] In fact the Santos opinion casts doubt onto this circuit's "promotion' test. While the dissent seems to support this circuit's precedent on "operating expenses," the plurality expresses some hostility toward this line of reasoning: "The federal money-laundering statute, however, bars not the bare act of promotion, but engaging in certain transactions 'with the intent to promote the carrying on of specified unlawful activity.' . . . Surely one promotes 'the carrying on' of a gambling enterprise by merely assuring that it continues in business." Id. at 2027; see also United States v. Krasinski, 545 F.3d 546, 550-51 (7th Cir. 2008) (using Santos plurality to support a broad interpretation of "promotion"). We need not reach this issue.

[34] United States v. Brown, 186 F.3d 661, 670 (5th Cir. 1999) (internal quotations and citations omitted).

The "benign expenditures" in Brown were deposits "into the operating account of an otherwise legitimate business enterprise" (an automobile dealership), and the money was then used "for general business purposes."[35] In another case, the expenditures for payroll taxes, rent, and payroll supported a business that, in addition to its fraudulent activities, provided medical care to patients.[36] The court noted: "The crime of money laundering promotion is aimed not at maintaining the legitimate aspects of a business nor at proscribing all expenditures of ill-gotten gains, but only at transactions which funnel ill-gotten gains directly back into the criminal venture."[37]

Achobe points out that the hydrocodone purchased in the charged transactions could be used for legitimate as well as illegitimate purchases. It is not contraband until it is sold – unlike, say, cocaine. He therefore argues that the charged payments are more analogous to those "maintaining the legitimate aspects of a business" than to those "funnel[ling] ill-gotten gains back directly into the criminal venture." Achobe seeks to benefit from the fact that what becomes contraband initially looks like it is not contraband; he stands convicted, of course, of abusing precisely the fact that these drugs have both legitimate and illegitimate uses. The government cannot and need not trace each individual pill or bottle. Achobe's unlawful activity required that he have hydrocodone on hand, and ordering from medical suppliers is the only known way for him to obtain hydrocodone. It is true that he may have purchased some hydrocodone that he legally distributed. But even on the assumption that he did so, he cannot frustrate the application of the money laundering statute by requiring prosecutors to prove that specific pills or bottles were illegal distributed. There

---

[35] Id. at 671.

[36] United States v. Miles, 360 F.3d 472, 478 (5th Cir. 2004); cf. United States v. Peterson, 244 F.3d 385 (5th Cir. 2001).

[37] Miles, 360 F.3d at 479.

is nothing to suggest that, as Achobe argues, his felonious conduct was "'relatively minor' incident of an 'otherwise legitimate business enterprise.'"[38] Achobe notes that he filled a mere 173 Callie Herpin prescriptions for hydrocodone over the course of a year, and he believes that this amount should relieve him from liability, since it represents a relatively small proportion of his vast hydrocodone sales and distribution activity.[39] Further, in another fact he strains to turn in favor of his argument, he claims his pharmacy was a "legitimate business"; although he concedes that he did not keep any normal "other products for sale in the pharmacy, like over the counter medicines or anything else" in the "front area" of his store, he claims he did stock such supplies, although they were kept in the "back area."

Achobe's claims to legitimacy are not credible and are not analogous to the "otherwise legitimate business enterprise" cases. Ultimately, the nature of the materials involved make this decision straightforward. The government demonstrated that he intended to illicitly sell hydrocodone, and it need not prove that all hydrocodone was sold illicitly to demonstrate that he purchased hydrocodone to "promote" his activity.

## B. Jury Instructions

Achobe also claims his version of the jury instructions should have been given. His proposed instructions include specific language on the "otherwise legitimate business enterprise" component of the money laundering promotion statute. But the instructions that the court approved, which closely track the model instructions on the issue and clearly lay out the contours of this crime, are

---

[38] Brief for Appellant at 63 (quoting Brown, 186 F.3d at 671).

[39] He notes that the government has not provided "proof beyond a reasonable doubt" that he filled fraudulent hydrocodone scripts for other doctors. This is true, in that such additional fraud was not charged, but the existence of other co-conspirators and related conspiracies are firmly supported by considerable evidence in the record.

not defective, and the decision not to provide further specific instructions is reviewed for abuse of discretion. Achobe has not pointed to any error that could meet this standard.

Claimed error in the jury instructions regarding the Santos "proceeds" issue has more traction but it also ultimately fails the test of plain error. Santos may have changed the definition of "proceeds," and the jury instructions may have been defective. But since this specific objection was not made below, the error would have to reach the standard of plain error. Given the nature of the evidence against Achobe and his co-defendants, which amply demonstrated that profitable transactions were supplying the funds then laundered, any error does not reach such a standard.

## V. PREJUDICE BY DISTRICT COURT

Relying on participation in the questioning of witnesses in United States v. Saenz,[40] Achobe argues that his conviction should be overturned for inappropriate questions asked and comments made by the district court. He cites numerous points in the record, most importantly during his direct testimony, when the district judge interposed comments and questions that, he alleges, prejudiced the impartiality of the tribunal and undermined his ability to defend himself.

Trial judges have considerable latitude over the "tone and tempo" of a trial, and a judge may "elicit further information from a witness if he believes it would benefit the jury."[41] "To rise to the level of constitutional error, the district judge's actions, viewed as a whole, must amount to an intervention that

---

[40] 134 F.3d 697 (5th Cir. 1998).

[41] United States v. Sanchez, 325 F.3d 600, 603 (5th Cir. 2003) (citing FED. R. EVID. 614(b)).

19

could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor."[42]

The appellant relies almost exclusively on Saenz. In Saenz, a panel of this court reversed a lower court's judgment and remanded the case for a new trial on the grounds that the judge's comments and questions during witness testimony had violated the necessary "strict impartiality" of the court. It held that the violation rose to the level of clear error. Achobe has preserved the error and we apply harmless error.

The Saenz court explained that its ruling was unusual. It emphasized that its analysis was based on the "totality of the circumstances," offering a review of how the judge's actions had "quantitatively and qualitatively" tainted the necessary appearance of impartiality. In addition to the sheer volume of comments involved, the particular sensitivity of the testimony undermined was a major factor in Saenz. As a later panel, in United States v. Cantu, characterized Saenz:

> In reaching our holding in Saenz, we emphasized that such a result obtained only because of the "unusual combination of circumstances" the case presented. Most importantly, the government's case in Saenz rested almost entirely on the testimony of a codefendant who was cooperating with the prosecution. As a result, the outcome of the case hinged on whether the jury believed the testimony of the government's witness or that of the defendant, who . . . testified in his own defense. In light of the crucial nature of the testimony of these two witnesses and the scant evidence supporting conviction (other than the cooperating witness' testimony), we held that the district court's substantial questioning of both key witnesses in a manner that could have appeared to convey partiality toward the prosecution required that we reverse the defendant's conviction and remand the case for a new trial.[43]

---

[42] United States v. Bermea, 30 F.3d 1539, 1569 (5th Cir. 1994).

[43] United States v. Cantu, 167 F.3d 198, 203 (5th Cir. 1999) (citations omitted).

The panel in Cantu distinguished the facts before it from those in Saenz, as did the panel in United States v. Sanchez.[44]

As Achobe notes, some of Judge Hittner's comments came during Achobe's direct testimony, and this case resembles Saenz in that aspect. For instance, during Achobe's direct testimony, when Achobe offered one of the strongest points in his favor by noting that he refused to deal further with Herpin after becoming suspicious of her prescription practices, the court intervened to ask: "Well, let me ask you this: Did you ever try to turn her into the DEA?" Such a comment works against Achobe effort to build his credibility through his direct testimony, and it suggests antagonism or incredulity on the part of the court. As in Saenz, Achobe's credibility in claiming not to have known that the Herpin scripts were illegitimate when he filled them is of the utmost importance. A few other comments and questions during Achobe's direct testimony give some pause,[45] as a defendant's direct testimony is of special sensitivity.[46]

---

[44] The standard of review in Sanchez was plain error. Sanchez, 325 F.3d at 608.

[45] At one point in particular, the court took over during Achobe's direct testimony on September 16, 2005. That the trial day was coming to a close is important. The exchange began around 5:30pm, as Achobe sought to demonstrate his meticulous record-keeping and adherence to pharmaceutical rules. Part of the questioning ran:

ACHOBE: This is the point: Don't come to me–if your hydrocodone is supposed to last 30 days, don't come to me–
THE COURT: Are you the only one that does all of that, you think, in the whole county? Is that what you're saying?
ACHOBE: I don't know.
THE COURT: Who else? Now, you're in the business. Who else does all this?
ACHOBE: That's my practice. I don't know. I don't know too many pharmacists. I'm sorry, Your Honor.
THE COURT: You don't know too many pharmacists?
ACHOBE: I don't visit too many other pharmacists and getting–very few people that I know.
THE COURT: Well, you are a professor. I mean, you know all–you should know a bunch of pharmacists.
ACHOBE: I know them, but, Your Honor, let me explain this very carefully. I know them; but if I came to your office or came to your pharmacy, I don't go into what you do.
THE COURT: Well, do you go to any continuing legal–any continuing

On the other hand, this was a large trial and significant amounts of evidence were adduced in favor of the government's argument, unlike in Saenz. Nor, in light of this large record, are the comments picked out by Achobe "quantitively" significant, as in Saenz. Achobe offers numerous excerpts from

---

pharmaceutical education or pharmacy education courses?

ACHOBE: Yes, yes.

THE COURT: Any of this ever been discussed?

ACHOBE: I–documented sometime.

THE COURT: No, no, like the–to the extent that you do it?

ACHOBE: It's been discussed, but sometime I go a little bit overboard.

THE COURT: All right. Have you been–have you been asked to be a speaker on what additional–what precautions you say that you do in every case?

ACHOBE: If somebody asked me to do it, I will be glad to share that information. Nobody has ever asked me, Your Honor.

BY MR. GLADDEN [Achobe's attorney]:

Q: Did you suggest to your students that were working under you to generate any sort of a patient medication profile with the kinds of–both questions and statements that you have them acknowledge?

A: Most of my students were not–they're two–we are talking about two different sets of pharmacy practice.

THE COURT: Hold it. Answer the question. Hold it a second.

ACHOBE: Your honor–

THE COURT: Wait a second. Read the question back. We're going to start moving here, okay?

(The last question was read.)

THE COURT: That's a yes or a no.

ACHOBE: Your honor, I don't want you to be mad at me.

THE COURT: I'm not mad at anybody. I'm just trying to move the case along.

ACHOBE: The hospital environment where I–

THE COURT: Okay, wait a second. Hold it.

MR. GLADDEN: I can–

ACHOBE: It's different.

THE COURT: Hold it, both of you-all.

ACHOBE: Okay, sir.

THE COURT: Okay. I'm not jumping the attorney. I'm asking the questions, and he's trying to give me the answers he wants to give. If you cannot answer it yes or no, tell me. You cannot answer it yes or no?

ACHOBE: No, sir.

THE COURT: Okay. He can't answer it yes or no. Fair enough. Mr. Gladden, next question.

Note that the court offered a lengthy curative instruction early the following day, at request of counsel.

[46] See id. at 608; Cantu, 167 F.3d at 203.

the trial record in support of his claim, and his counsel, having assiduously combed through the record, has presented some instances of intervention by the lower court that, when read in isolation, cast some doubt on the trial. All but a couple of his proffered examples, however, fade into total insignificance when read in context. The trial was complex and lengthy, and as the Saenz court recognized: "The need for a trial court to question witnesses to clarify testimony is greatest in a complex or lengthy case . . . ."[47] As a trial day closes, trial counsel can expect a push from the court to conclude. And this timing is not lost on a jury facing a commute home and a return the next day.

In the end, upon review of the entire trial record, which stretches to many thousands of pages, we reject Achobe's claim. Saenz was a simple trial, lasting not even two full days. Here, the comments arguably of questionable tone fail to dominate the lengthy record. Achobe's direct testimony alone stretched to approximately five hours over two days. Nor do they lead us to conclude that the jury is likely to have doubted the impartiality of Judge Hittner, whose attention to the needs of the jury is evident throughout the record. The court does not appear to have been biased or to have communicated bias, certainly not to a level that would "seriously affect[] the fairness, integrity, or public reputation of the judicial proceeding."[48] This impression is re-affirmed by the lower courts' repeated comments to the jury not to construe any of its utterances as supporting the case made by either the prosecution or the defense. Some of the court's interventions were arguably unwise and close to indicating partiality, but given the scope of this trial and their context, they do not merit reversal of the convictions. That said, we will not hesitate to find error when a trial judge forgets that he is no longer at counsel table.

---

[47] Saenz, 134 F.3d at 703.

[48] Sanchez, 325 F.3d at 609.

## VI. ADOPTION OF ARGUMENTS

Achobe asserts that because the lower court "ruled that all motions or objections by one defendant would be deemed adopted by every other defendant," he can "incorporate[] mutatis mutandis all arguments made by his co-defendants in their appeals. . . . The government has stipulated that Federal Rule of Appellate Procedure 28(i) applies to this case to the same extent as if Mr. Achobe's appeal had not been severed." The government did not answer this assertion, and we need not reach the issue of which of his co-defendants' arguments Achobe could adopt, because Achobe's co-defendants presented no compelling arguments on appeal on any issue relevant to Achobe.

## VII.  EFFECTS OF REVERSAL OF COUNTS 20 AND 25

Any portions of Achobe's sentence of imprisonment or monetary penalties relating to counts 20 and 25 must be and are vacated. We leave any appropriate adjustments in sentence and penalties to the district court.

## VIII.  CONCLUSION

For the reasons stated above, the judgment below is AFFIRMED as to all counts but 20 and 25, which are REVERSED, and the sentences relating to these counts VACATED. This case is REMANDED for further proceedings consistent with this opinion including any additional sentencing proceedings found necessary by the district court.